ELISHA PULSE, APPELLANT, *v.* JAMES HAMER, RE-
SPONDENT.

PAROL AGREEMENT, POSSESSION OF LAND UNDER.—Where one man agrees
by parol with another to lease land for a term of years, to begin in the
future, and agrees to put such parol contract in writing, and no consid-
eration passes between the parties, either party may disregard the parol
contract, and if the lessee go on the land at the commencement of the
term named in the parol agreement without the request of the lessor, his
possession thus obtained will not give him any rights under such parol
agreement.

APPEAL from Benton County.

This is an action to recover one thousand four hundred
and eight dollars for the non-performance of a verbal con-
tract for the leasing of certain premises. The terms of the
contract are shown in the testimony recited in the opinion.

*F. A. Chenoweth and F. M. Johnson,* for appellant.

*J. W. Rayburn, John Kelsay, and John Burnett,* for re-
spondent.

By the Court, BOISE, J.:

To prove the contract as set up by the plaintiff in his com-
plaint, the plaintiff offers himself as a witness and testifies
as follows:

Question 2. "State the terms of the contract between
you and the defendant, Mr. Hamer, in regard to the lease
of his ranch mentioned and described in your complaint."

Answer. "In the spring of 1877, or rather in the summer,
I had been informed that Mr. Hamer had a place to lease,
and I went to see him some time the first of July—do not
recollect the day and date. Mr. Rust informed me that
Mr. Hamer had this place to lease, and stock, and I went to
see him and told him what Mr. Rust told me, and he asked
me what it was. I told him I understood he had his place
and stock there to lease. He said he did. I asked him on
what terms he would lease it, or a something to that amount.
He said that he would furnish twenty or twenty-five cows
and calves—cows that would come in; he would furnish me

eight three-year-old heifers that fall that would have calves, and furnish feed to feed them on in case they should need it; that he thought they would give milk enough to keep the calves that winter, and he would in the spring following furnish me with gentle cows, or brake cows enough to make out twenty or twenty-five head; that if he didn't have cows enough to make out the twenty-five head he thought the probabilities were in the spring he would have enough of two-year-old heifers to make out the twenty-five head, and I was to give him half of the increase of the cows—the calves; also I was to give him half of the grass that grew on the meadow; that the place, with the exception of the meadow, I was to have all I made upon it, and I told him I thought I would take the contract—and went back home—and told him that if my wife was willing to go in there I would drop him a little note to let him know, which I did. I got no answer till up in August some time, as well as I recollect—till him and Mr. Conner came into the field where I was harvesting. Mr. Hamer said that he had got my note—didn't deem it necessary to answer it, as he was coming up himself. We talked the matter over, with other things, and I asked Mr. Hamer there at that time to tell me how many cows and calves he would furnish me to keep on the shares in case I went down there. I told him the cattle was all that induced me to go down there, and he said he didn't know just exactly how many he could or would have, but he would furnish eight three-year-old heifers, that was spoken of before, and in the spring he would furnish me gentle cattle, or broke cattle, enough to make me out twenty or twenty-five head, he thought, anyhow, and if there was not enough to make out the contract heretofore spoken of, he would have some nice young two-year-old heifers that would come in in the spring that could or would make out the number that he had agreed to. Mr. Hamer then turned to me and said, we will have it down in writings. I told him that that was the proper and right way to do business, as well as I recollect. He then asked me when I could move on the place. I told him probably I could move on to it by the first of October, and on the tenth of October of that

year I moved on the said ranch that's named in the com-
plaint.   When I went there Mr. Hamer was not about, and
no one on the place.   I moved into the house, and in a day
or two, or a few days, Mr. Hamer came.   It appeared like
everything was satisfactory.   He went away, and in about
one or two weeks after that, he came back to gather up his
stock, with his son, or two sons, rather son and son-in-law,
Mr. Dixon."

George Pulse, the son of the plaintiff, testifies:

"Question 2. Please state what, if anything, was said by
Mr. Hamer about reducing the contract to writing.   Give
as near as you can the words used by both parties.

"Answer. He was to have it down in writings.   He said
then he didn't have time to draw them there.

"Question 3. Which one of the parties was it that you
mean by he, Mr. Hamer or Mr. Pulse?

"Answer. Mr. Hamer."

This is the proof of the contract and the agreement to
put it in writing offered by Mr. Pulse.   The time of making
the contract was in August, 1877.   There is no proof of any
other contract or conversation between the parties on this
subject until after Mr. Pulse went on the farm of Mr.
Hamer, on October 10, 1877.   So the contract stood in
parol with no act or word of either party in relation to put-
ting it in writing until after Mr. Pulse went on the place.
There is no evidence tending to show that Mr. Hamer re-
quested Mr. Pulse to go on the farm under the parol con-
tract made in August.   The parol contract was void, and
unless it was partly performed by one of the parties at the
request of the other, it could never create any obligation.
If before Mr. Pulse went on the farm he had requested Mr.
Hamer to put this contract in writing and thereby make it
legal and binding, and Mr. Hamer had refused to put it in
writing, Mr. Pulse would have had no remedy, for the con-
tract was simply void, and could be disregarded by either
party.   If Mr. Pulse, before he went on the farm, had re-
quested Mr. Hamer to reduce the contract to writing, and
Mr. Hamer had said to him, I am too busy now to do it,
but you move on the farm and go on with your part of the

contract, and I will have it put in writing, and Mr. Pulse, in consideration of this promise, had gone on the place and made improvements and prepared to perform his part of the contract, it would present a different case.   So, also, if after Mr. Pulse had gone on the place, Mr. Hamer had promised to put the contract in writing, and Mr. Pulse had in consideration thereof gone on and complied on his part with the contract.   But in this case it does not appear from the testimony that Hamer requested Pulse to do any act under this contract, or even induced Pulse to incur any expense or loss in consideration that he would reduce this contract to writing.

We think that where one man agrees by parol to lease land to another for a term of years, to begin in the future, and agrees at the same time to put such parol contract in writing, and no consideration passes between the parties, either party may disregard the parol contract, and if the lessee go on the land at the commencement of the term named in the parol agreement without the request of the lessor, his possession thus obtained will not give him any rights under such parol contract.

This point being held for the respondent, all the other questions discussed by the counsel become immaterial, for there could be no specific performance of the contract.

The decree of the circuit court will be affirmed, with costs.