Argued March 20; affirmed April 15, 1947

# DODGE ET AL. *v.* DAVIES ET AL.

(179 P. (2d) 735)

*William S. Fort* and *Edward R. Butler,* both of Eugene (Harris, Bryson & Riddlesbarger, and William S. Fort, all of Eugene, on brief), for appellants.

*Kenneth J. O'Connell,* of Eugene (O'Connell & Darling of Eugene, on brief), for respondents.

Before ROSSMAN, Chief Justice, and LUSK, BAILEY, HAY and WINSLOW, Justices.

HAY, J.

In August, 1943, the defendants John N. Davies, Hazel Davies and Dora Coldren, and Edson Coldren (the latter now deceased) were the owners of certain real property in Springfield, Oregon, upon which there had been erected a building, a portion of which was used as a motion-picture theatre. The plaintiffs claim that, on or about August 1, 1943, they entered into possession of the theatre as tenants. Their complaint alleges that their occupancy was preceded by an agreement, whereby the owners leased the premises to them for a term of five years at a rental of $62.50 per month, payable monthly in advance, with the right, at the expiration of the term, to an extension thereof. It alleges further that plaintiffs, in reliance upon the lease and with the knowledge and approval of the owners, expended $7,900 in cash in purchasing the theatre equipment and good-will of the outgoing tenant; that, moreover, after taking possession, they made substantial and permanent improvements to the property, at a cost in excess of $500; and that, on March 21, 1946, the property was purchased by the defendants Pedron,

who thereupon repudiated the lease and demanded possession of the premises. A decree for specific performance is prayed for.

The defendants Davies and Dora Coldren, by their answers, admit, in effect, the allegations of the complaint. The defendants Pedron make general denial, and affirmatively allege their ownership of the premises in dispute, and that they have demanded possession thereof from plaintiffs. For an affirmative reply, the plaintiffs allege that, at the time when defendants Pedron took title to the premises, they did so with notice and knowledge of the fact that plaintiffs were in possession thereof as lessees, and of the terms of their lease, and are estopped to assert anything to the contrary.

At the conclusion of the hearing, the court, after taking the case under advisement, made findings and conclusions in favor of defendants, and entered a decree thereon. Plaintiffs appeal.

The plaintiffs' theory of the case is that they hold the premises by virtue of an oral lease for five years, which was taken out of the statute of frauds by acts of part performance.

It appears that, prior to August, 1943, one Durkee occupied the premises as tenant. He was operating a motion-picture theatre therein. Plaintiffs had been negotiating with Durkee for the purchase of his equipment and furniture and the good-will of his business, and, on July 1, 1943, they secured from him a written option thereon. The agreed price was to be $7,900, of which $500 was paid down and the remainder deposited in escrow. The option was conditioned upon plaintiffs' receiving assurance from the owners of the premises of their willingness to accept them as tenants. Before securing the option, plaintiffs had

communicated with defendant John N. Davies, who resided in Porterville, California. The exact terms of the communication are not in evidence, but, under date of July 1, 1943, plaintiffs received from Mr. Davies the following telegram:

"DURKEES LEASE WHICH EXPIRED DECEMBER THIRTY FIRST 1942 PROVIDED FOR A FIVE YEAR RENEWAL AT SEVENTY FIVE DOLLARS PER MONTH WHICH OPTION WAS NEVER EXERCISED I INTEND ADVANCING HIS RENT TO SEVENTY FIVE AUGUST FIRST BUT WOULD GIVE YOU FIVE YEAR LEASE ON THEATRE AT SIXTY FIVE PER MONTH."

Upon receipt of this telegram, plaintiffs, through their attorney, Mr. William S. Fort, communicated further with Mr. Davies by letter. Mr. Davies responded by letter under date of July 11, 1943, as follows:

"This will acknowledge receipt of your letter of July 3rd and reply was delayed as I was away from home for a few days and have just returned.

"I had previously received a telegram from Messrs. Dodge and Carpenter inquiring as to Durkees lease (there being none at present) and if I would lease them the theatre room in case they bought, to which I replied by wire, addressing it as requested to the bank in Springfield, and I told them the present status, also that I was willing to give them a five year lease on the room in case they bought the theatre, at a rental of $65.00 a month.

"I take it from your letter that Dodge and Carpenter probably plan on making about the same improvements in the property that was contemplated by Mr. Gessler. I am willing to make the same kind of a deal to them that I would have done to Mr. Gessler. As you already have most of the terms and conditions outlined in my agreement with

Mr. Gessler it will not be necessary to go over these details but I believe, in drawing up the lease, which will be for five years at $62.50 per month, the lease should read I would suggest for the total sum, something like this: '———— To have and to hold said premises unto the lessees from ———— 1943 for and during the full term of five years thence ensuing, and to be fully complete and ended on ———— 1948, yielding and paying therefor unto the said lessor a total rent for said term of the sum of $3,750.00, payable in monthly installments of $62.50 per month beginning with etc., etc.'

"I would be willing to give your clients, at the expiration of the lease, the refusal of a new lease, on the same terms and conditions as available to anyone else.

"I have never been able to find my copy of the lease and am beginning to wonder if it was ever moved here. Very likely it could be stored among papers at Kennewick, Washington, but no one else could find it and I will not be going up there probably until about September. I do wish Mr. Durkee could locate his copy but if not I imagine we can go ahead and draw up another lease as I have given you, from memory when I was in your office, some of the main provisions of the former lease. Sooner or later I will come across my copy to verify with your clients what I have said, or Mr. Durkee may yet find his copy. I would make this suggestion. It surely would not do any harm for you to write to Mrs. Durkee, c/o The First National Bank in Port Angeles, Wash. and ask her to send her copy of the lease to you. The thought occurred to me, although the idea may not be worth anything, that if the Durkees were given the idea that it was absolutely necessary for them to produce their lease before any deal could be made, they might make an extra effort to find it. And they might succeed in doing so. *I would be better satisfied, and I believe your clients would too, if they had the oppor-*

*tunity of going over the original lease before going into a new one."* (Italics ours.)

The italicized portion of the letter is significant, as showing that no agreement had been arrived at. All that can be read into the telegram and letter, in our opinion, is a willingness on the part of the owners to give plaintiffs a five-year lease at $65 (or perhaps $62.50) a month, and "to make the same kind of a deal" with them as the owners "would have done to Mr. Gessler", (whatever that may have been). A portion of the opinion in *Bevan v. Templeman,* 145 Or. 279, 288, 26 P. (2d) 775, appears to be pertinent to the situation. We quote:

"Under this agreement, it was not in the power of either the lessor or the lessee to determine what the conditions were that would be satisfactory to both parties. It left certain matters to be determined later. It is too indefinite in itself to constitute a contract to lease. It fixes no length of term nor the rental reserved. It does say 'on terms satisfactory to both of us'. This means that the lessor and the lessee at some future time should agree on the terms of the lease before it should be made. It amounts to no more than the lessor saying that at the present time he would consider the lessee a satisfactory tenant provided they could agree on terms.   *   *   *   "

Mr. Dodge testified that he considered "we had a lease from Mr. Davies when we got the telegram back", but this assumption is contradicted both by the terms of the telegram and by those of the Davies letter.

Plaintiffs took possession of the premises on August 1, 1943, and, as far as the lease was concerned, Mr. Davies testified: "I sent that letter of confirmation, and that's about all that was done until we started to prepare a lease to follow that up". The plaintiffs

agreed that he should "go ahead and complete the lease and they would sign it". Before the lease was drawn, however, Mr. Coldren, one of the owners, died. Mr. Davies then purchased the Coldren interests. He told plaintiffs to prepare a lease and send it to him. They did so, but it was not entirely satisfactory to him, and he notified them that he would prepare one. About a year and a half later, Mr. Davies brought to Springfield a lease that he had prepared. This lease was never exhibited to plaintiffs, and, on the hearing, there was no proof of its contents. It was not executed by the parties.

In January, 1946, the defendants Pedron purchased the property. Mr. Davies testified that a copy of the unsigned lease was delivered to Mr. Pedron, and, at the hearing, counsel for the Pedrons, on demand, produced an instrument which was in Mr. Pedron's possession, but Mr. Davies was unable to identify this instrument as being the lease in question. Mr. Davies testified respecting the reasons for the delay in "getting out that lease." He was a thousand miles away, and busy, and plaintiffs also were busy. He expected to be coming back to Springfield "'most any time", and that he intended to deliver the lease in person. He was "all ready" to sign the lease at the time when negotiations were entered into for sale of the property to the Pedrons. He said that he gave Mr. Pedron full notice regarding "his obligation — his commitment" with respect to the lease, and gave his conclusion that the lease, although unsigned, was recognized by both parties. He said further that Mr. Pedron requested that the lease "wouldn't be signed until he took possession, and that he would finish the deal".

Immediately after purchasing the property, the Pedrons notified plaintiffs that the rent would be

increased to $65 a month. Plaintiffs acceded to the increase without objection. Their complaint alleges that the increase was based upon an agreement between them and the Pedrons amending their lease, but no evidence was offered in substantiation of such allegation.

The plaintiffs contend that the essential elements of a lease had been agreed upon, namely, (1) description of property, (2) duration of term, and (3) rental consideration. *Bevan v. Templeman,* supra (145 Or. 279, 288, 26 P. (2d) 775); *Bushman v. Faltis,* 184 Mich. 172, 150 N. W. 848, 851; *Read Drug & Chemical Co. v. Nattans,* 129 Md. 67, 98 A. 158, 160; *Bennett v. Moon,* 110 Neb. 692, 194 N. W. 802, 31 A. L. R. 495, 499.

An agreement for the leasing of real property for a period longer than one year is within the statute of frauds. Section 2-909 (6), O. C. L. A.

■■ We have considered the evidence with care. The plaintiffs were assured by Mr. Davies that they would be satisfactory tenants, and that the owners were willing to give them a five-year lease upon the same terms as had been offered to Gessler, but there is no evidence that the parties agreed upon such terms. Moreover, even assuming that there was an oral agreement with Mr. Davies, there was no evidence that he was authorized to bind his co-owners thereby. Plaintiffs' taking possession of the premises, under the circumstances, constituted them at best simply tenants from month to month. They themselves prepared a form of lease and submitted it to Mr. Davies, but he disapproved it. Mr. Dodge, in this connection, testified that Mr. Davies "wanted one that was a little more— He had a pet clause which was in Mr. Durkee's lease which he wanted to incorporate. * * *" Not only does the evidence show that the lessors desired that

the lease should include more than above-mentioned three basic and irreducible essentials, but, even as to those, no definite agreement was reached, as the date of commencement of the term was not fixed, and the amount of rental is indefinite.

The property was commercial property, used in the conduct of a business which, as involving considerable risks of injury to persons and property, is, very properly, the subject of public regulation and control. It is likely that any lease which the owners might have been willing to grant would have included clauses obliging the tenants to comply with all proper public regulatory requirements. We can only speculate upon what other "pet clauses" the owners might have insisted upon, whether of those peculiarly adapted to the business of operating a motion-picture theatre or of those deemed desirable or necessary by lessors of commercial property generally. We do not know, moreover, what conditions or restrictions in the lease the tenants would have been willing to accept.

This is not a case in which parties have entered into an executory agreement to make a lease, such agreement definitely including the particular essentials of the lease, but being silent in respect of the "usual conditions, covenants, and other general provisions contained in an ordinary lease." In such cases, it is held that the usual covenants, etc., will be implied, and specific performance may be granted. *Bennett v. Moon*, supra (110 Neb. 692, 194 N. W. 802, 31 A. L. R. 495, 499,) and annotation, 31 A. L. R. 502. Nor is this case one in which the parties had agreed upon the substantial terms of a lease, but left minor details to be arrived at later. *Edwards v. Tobin*, 132 Or. 38, 284 P. 562, 68 A. L. R. 152. Here, there were terms of importance as to which the parties had not agreed.

■ The plaintiffs, with knowledge that a written lease was necessary for their protection and that no final agreement respecting such lease had been reached, took possession of the property, and thereafter dallied through more than two years of intermittent and inconclusive negotiations with the owners. Obviously, they had confidence that the owners would treat them fairly, but, equally obviously, they had no lease. The court, without knowing that terms had been agreed upon and what those terms were, could not have decreed specific performance. Even if we were to assume that the conditions, as to which no agreement had been reached, were the "usual" ones in such cases (which, under the circumstances of the case, we cannot do), there is no proof before us what such "usual" conditions were, and we think that, if usage was to be relied upon in this connection, it should have been proved. *Mercer v. Payne,* 110 Neb. 28, 192 N. W. 951.

■ Before the court may consider the sufficiency of acts of part performance to take an oral contract out of the statute of frauds, the contract itself must be proved. The plaintiffs' evidence in the case at bar is not unequivocal, and, in our opinion, it fails to meet the test laid down by Mr. Justice BURNETT in *Le Vee v. Le Vee,* 93 Or. 370, 377, 181 P. 351, 183 P. 773, as follows:

" * * * The general rule is that the plaintiff must prove the agreement * * * clearly and unequivocally by the preponderance of the evidence. If the testimony taken altogether is equivocal in its effect, so that it is left uncertain which is the true solution of the question, the plaintiff has failed to make his case by the preponderance of the testimony. * * * "

Plaintiffs, upon taking possession of the property,

exercised their option to purchase the outgoing tenant's equipment and good-will, and expended money and labor in making the premises more suitable for theatre purposes. They spent some $840 for materials in the latter connection, although it is questionable whether all of this was for improvements in the strict sense. For example, $492.94 was for new carpeting. It cannot be said, however, that such possession and acts of improvement were referable to and induced by the alleged oral lease, for no agreement with reference to terms of lease had been arrived at. Plaintiffs' reliance was definitely upon the verbal promise of Davies that, if they purchased the interests of the outgoing tenant, the owners would give them a five-year lease at $65 or $62.50 a month, upon terms to be agreed upon. No estoppel against the owners could be predicated upon such promise, nor could the owners have been compelled to perform it, for it lacked the essentials of an enforcible agreement. A somewhat similar case is to be found in *Dechenbach v. Rima,* 45 Or. 500, 77 P. 391, 78 P. 666, in which a person, having taken possession of certain leased premises held by a tenant under an unexpired lease, and having purchased the tenant's fixtures and made valuable improvements to the property in reliance upon the landlord's oral promise to give him a written lease for a period exceeding one year, was held not to be entitled to enforce the agreement in equity, since the landlord, before the expiration of the outgoing tenant's lease, repudiated his agreement. The case is not quite on all fours with the facts in the case at bar. The defendant in the Rima case entered into possession and made his improvements while the outgoing tenant's lease still had some time to run, but he did have the landlord's oral agreement to lease to him. The opinion quotes from

the opinion of Mr. Justice FIELD in *Union Mutual Life Insurance Co. v. Mowry,* 96 U. S. 544, 24 L. Ed. 674, some instructive general observations which are pertinent upon the question of estoppel. We quote:

" * * * If the representation relate to something to be afterwards brought into existence, it will amount only to a declaration of intention or of opinion, liable to modification or abandonment upon a change of circumstances of which neither party can have any certain knowledge. The only case in which a representation as to the future can be held to operate as an estoppel is where it relates to an intended abandonment of an existing right, and is made to influence others, and by which they have been induced to act. An estoppel cannot arise from a promise as to future action with respect to a right to be acquired upon an agreement not yet made. * * * But the doctrine has no place for application when the statement relates to rights depending upon contracts yet to be made, to which the person complaining is to be a party. He has it in his power in such cases to guard in advance against any consequences of a subsequent change of intention and conduct by the person with whom he is dealing."

Of course, if an oral lease had actually been effected, and plaintiffs had gone into possession of the property and made substantial improvements in part performance thereof, specific performance would lie. *Pulse v. Hamer,* 8 Or. 251, 253; *Wallace v. Scoggins,* 18 Or. 502, 505, 21 P. 558; *Sprague v. Jessup,* 48 Or. 211, 215, 217, 83 P. 145, 84 P. 802, 4 L. R. A. (N. S.) 410; *West v. Washington Ry. Co.,* 49 Or. 436, 448, 90 P. 666; *Dwight v. Giebisch,* 77 Or. 254, 263, 150 P. 749; *Friberg v. Bjelland,* 95 Or. 320, 322, 186 P. 1113; *Dunis v. Director,* 121 Or. 500, 507, 255 P. 474. To take such an oral lease out of the statute of frauds, however, the acts of part performance must be exclusively refer-

able to the oral lease. *Brown v. Lord,* 7 Or. 302; *Wallace v. Scoggins,* supra; *Dunis v. Director,* supra; *Brennen v. Darby,* 124 Or. 574, 265 P. 425. There having been no oral lease in existence, the performance of the acts upon which plaintiffs rely was unavailing.

The purchase of the interests of the outgoing tenant was in any event no part of any agreement between plaintiffs and the owners, although, in making the purchase, plaintiffs undoubtedly relied upon Davies' assurance that they would be acceptable to the owners as tenants. *Jenning v. Miller,* 48 Or. 201, 204, 85 P. 517.

■ Having failed to establish unequivocally the existence of the alleged lease, the plaintiffs are not entitled to equitable aid to evade the penalty for failure to observe the requirements of the statute of frauds. *Wagonblast v. Whitney,* 12 Or. 83, 88, 6 P. 399; *Goff v. Kelsey,* 78 Or. 337, 341, 153 P. 103; *Le Vee v. Le Vee,* supra (93 Or. 370, 376, 181 P. 351); *Brennen v. Derby,* supra (124 Or. 574, 579, 265 P. 425); *Noonan v. Mott,* 194 N. Y. S. 502, 505; *Woods v. Matthews,* 224 Mass. 577, 113 N. E. 201, 203.

"  *  *  * In order that any agreement, whether covered by the statute or not, whether written or verbal, may be specifically enforced, it must be complete in all its parts; that is, all the terms which the parties have adopted, as portions of their contract, must be finally and definitely settled, and none must be left to be determined by future negotiation; *and this is true without any regard to the comparative importance or unimportance of these several terms.*  *  *  * " (Italics ours.)

Pomeroy's Specific Performance, 3 ed., § 145, p. 378.

"  *  *  * The peril of perjury and error is latent in the spoken promise. Such, at least, is the warning of the statute, the estimate of policy that finds expression in its mandate. Equity, in assum-

ing what is in substance a dispensing power, does not treat the statute as irrelevant, nor ignore the warning altogether.  *  *  *  A power of dispensation, departing from the letter in supposed adherence to the spirit, involves an assumption of jurisdiction easily abused, and justified only within the limits imposed by history and precedent. The power is not exercised unless the policy of the law is saved.  Pound, Equity and the Statute of Frauds, 33 Harvard Law Review, 933, 944."

*Burns v. McCormick*, 233 N. Y. 230, 135 N. E. 273, 274, per Cardozo, J.

Plaintiffs claim that the defendants, by admitting the parol agreement, waived the defense of the statute of frauds.  The admission to which they refer is contained in the separate answers of the defendants Davies and Coldren, and is not contained in the Pedron answer.

■■■ The defense of the statute of frauds is personal and may be relied upon only by parties to the contract or their privies.  Browne, Statute of Frauds, 4 ed., p. 151; *Clarke v. Philomath College*, 99 Or. 366, 384, 193 P. 470, 195 P. 822.  An admission in a pleading may be evidence against the pleader, but not against a coplaintiff or codefendant of the pleader.  1 Jones on Evidence, 4 ed. section 273.  An admission in the answer of one defendant is not conclusive upon other defendants.  *Murphy v. Bjelik*, 87 Or. 329, 344, 169 P. 520 (rehearing denied, 87 Or. 356, 170 P. 723).  The answer of a defendant may be used as evidence in favor of a plaintiff and against a codefendant where they are partners in the same transaction, or one has acted as agent of the other in a transaction to which the answer relates, and the partnership or agency still exists at the time of the filing of the answer.  30 C. J. S., Equity, section 468a.  There are a few cases holding that, where one defendant succeeds to another, the

answer of one may be read in evidence against the other, they being privies in estate. *Osborn v. Bank of United States,* 9 Wheat. 738, 830, 6 L. Ed. 204; *Townsend v. McIntosh,* 14 Ind. 57, 60; *Lockman v. Miller,* (Miss.) 22 So. 822. By the weight of authority, however, in order that an admission in an answer may be available against a codefendant, the privity of estate, partnership or agency between the defendants must be one existing at the time of the filing of the answer. Admissions of a defendant, made after he has parted with his interest in the subjects of the controversy, are not competent evidence against his codefendant. 1 Greenleaf, Evidence, section 179; Anno., 14 A. L. R. 22, 41. (*Osborn v. Bank of United States* and *Lockman v. Miller,* supra, are criticised by the editors of A. L. R., as being contrary to the general rule.) The defendants Davies and Coldren having parted with their interest in the property prior to the filing of their answers herein, we hold that the admissions of their answers were not available to plaintiffs as evidence against their codefendants.

■ It is argued that plaintiffs' possession of the premises at the time when the Pedrons took title from the Davieses was notice to the Pedrons sufficient to put them on inquiry so as to ascertain the nature of whatever rights, legal or equitable, the latter claimed, and that, if they neglected to make such inquiry, they took title subject to such rights. *Bohlman v. Coffin,* 4 Or. 313, 318; *Randall v. Lingwall,* 43 Or. 383, 386, 73 P. 1; *Belt v. Matson,* 120 Or. 313, 320, 252 P. 80; 39 Am. Jur., Notice and Notices, section 18. All that inquiry by the Pedrons would have disclosed, however, was that, while plaintiffs claimed to hold the premises under lease, no lease in fact existed.

At the hearing, the defendants offered no evidence whatever, but, when plaintiffs had rested their case, defendants Pedron moved "for a dismissal with prejudice or a decree for the defendants". Counsel have argued the effect of such a motion in a suit in equity, but, in view of our holding that plaintiffs failed to make a case for equitable relief, we need not determine that question.

The decree of the circuit court is affirmed, with costs.