Argued October 25; reversed and remanded November 30, 1948.
Petition for rehearing denied January 5, 1949

BURNETT *v.* LEMON, ET UX.

199 P. (2d) 910

*A. S. Cooley,* of Pendleton, argued the cause and filed a brief for appellants.

*O. B. Setters,* of Portland, argued the cause and filed a brief for respondent.

Before ROSSMAN, Chief Justice, and LUSK, BELT, BAILEY and HAY, Justices.

BELT, J.

This suit was commenced October 3, 1941, to obtain a dissolution of an alleged partnership and for an accounting. It is alleged in the complaint that the plaintiff, S. M. Burnett, and the defendant, D. L. Lemon, in May, 1937, entered into an oral partnership agreement for the purpose of acquiring, operating, and managing personal and real property, and that pursuant thereto, the partnership did acquire, own and operate certain real property in Gilliam county, Oregon, to-wit: "Sam Burnett Ranch" consisting of 720 acres; "Dean Ranch" of 1120 acres; and "School Land" of 160 acres. Plaintiff alleges that under this partnership agreement he was "to be in active charge of the direct management of the farming operations and of the handling of the live stock" and "to devote all of his time to said duties," and that defendant was to furnish the necessary finances for the operation of the ranches. It is further alleged that defendant was to keep the books and "handling of the finances," and to account to plaintiff for his share of the profits. Plaintiff further alleges that defendant has failed and refused to render any accounting to him relative to the operation of the farms, although requested so to do.

Plaintiff prays for a decree providing, among other things, that: (1) Partnership be dissolved. (2) Receiver be appointed to take charge of assets of partnership. (3) Accounting be had of all partnership business, including "all funds, interests, equities, and receipts" of the partnership. (4) Receiver be authorized to sell,

under order of court, all partnership property and from proceeds thereof pay all debts, and divide surplus equally between the parties hereto.

The answer of the defendant was in the nature of a general denial.

After hearing the cause on its merits, the circuit court entered a decree that a partnership existed so far as the operation of the ranches was concerned, and that defendant, by reason of the profits derived from such operation, was indebted to plaintiff in the sum of $2,368.84, together with interest thereon, but that the partnership did not include the ownership of the land and that plaintiff had no interest in the same.

From this decree the defendant appeals and the plaintiff cross appeals.

It may be well at this juncture to direct attention to certain phases of the case in order better to consider the facts out of which this unfortunate controversy arose between two life-long friends. The precise issues of fact are: Did the parties intend to create a partnership? If they did, what was the scope of the partnership agreement? Did it include both ownership of the property and profits derived from the operation of the ranch? If the agreement, as held by the circuit court, covered only the operation of the property, then was plaintiff awarded the proper amount on accounting? If no partnership whatever existed, then it follows that the suit must be dismissed.

In determining the question of fact as to whether the parties entered into a partnership agreement in 1937, as alleged in the complaint, we deem it proper to consider the relationship existing between the parties and their various business transactions prior and subsequent to the time of the creation of the alleged partner-

ship. Throughout the record the parties are respectively referred to as Sam and Dave, and we will in many instances so refer to them.

The plaintiff, Sam Burnett, is a bachelor and is now approximately 76 years of age. In 1921 Sam acquired the "Burnett Ranch," located about eight miles distant from Arlington. Apparently, Sam was not a successful farmer. He had only horse-drawn equipment and the elements seemed to conspire against him. The crops of wheat were poor. He was slowly but surely losing out, and the ranch was slipping away from him. Dave Lemon, who is now about 56 years of age, was a successful business man engaged in the garage business in Arlington under the firm name of "Snell & Lemon." Dave financed Sam in his farming operation and loaned him money from time to time. Pursuant to agreement, Dave kept the books, sold the crops and applied the proceeds to Sam's indebtedness. From the time Sam acquired the "Burnett Ranch" in 1921, he was continually in debt to Dave. The accuracy of the latter's account was never questioned. It seems that Dave was trying to help Sam to "hang on" to his ranch, and at the same time protect his own interests. ·

The "Burnett Ranch" was encumbered by a mortgage in favor of the Oregon-Washington Joint Stock Land Bank at Spokane, Washington, in the sum of $5,000.00. In 1929, Sam sold the ranch to Cartwright and Morrison and took back a second mortgage. This second mortgage was assigned to W. L. Graham, a real estate broker of Portland, Oregon, to secure Sam's indebtedness to him. When Sam sold the ranch in 1929, he went to Portland and dabbled in the real estate business. At that time Dave had a note of Sam's on which there was due $434.53. Graham foreclosed the mort-

58

gage in 1931, and Sam returned to occupy the ranch as a tenant on a crop share basis.

Plaintiff on cross examination thus testified:

"Q During the time you were farming, when it stood in Graham's name, who took the proceeds of the tenant's share of the crop? Did not Dave get it? Didn't Dave always get it? Isn't it a fact that from the time you came back from Portland up until '35 when Graham had it in his name, and even beyond that, isn't it a fact that Dave got the proceeds from the sale of the crop, or any part of the crop that belonged to you?

"A Yes.

"Q Exactly. Now why was Dave taking the proceeds from the crop all of those years? You were not partners then. Why was Dave taking the proceeds of the crop that belonged to you? Isn't it a fact that he took them because you were indebted to him all the time, or indebted to the garage, all the time, and you were in debt to him and he was financing you and trying to help you out?

"A Yes."

When the bank in Spokane was in the process of liquidation, the Receiver in 1935 instituted proceedings to foreclose its mortgage. Sam continued to live on the ranch and operated it as a tenant of the bank.

In May, 1937, the "Burnett Ranch" was purchased from the bank for the sum of $4,500.00. Dave admittedly furnished the money to buy this property, and the title was taken in his name and that of his wife. At the time of this transaction, Dave claims that Sam was indebted to him about $2,000. Counsel for the plaintiff concedes that the books kept by Dave so show, but asserts that Dave had assets of the plaintiff which, if credited to him, would more than off-set such indebtedness. More specifically, Sam contends that he was not

given credit for his share of the crop of wheat harvested by him in 1937. The wheat crop was substantially the only source of Sam's income. The books refute the claim that Sam was not given credit for the 1937 crop of wheat. The account—lacking about $50.00 —was balanced when Dave credited Sam with the amount derived from the sale of the wheat.

In the same year that the "Burnett Ranch" was acquired, the adjoining "Dean Ranch," consisting of 1120 acres, was purchased for the sum of $3,100.00. Dave furnished the money, and title was taken in the name of Lemon and his wife, Margaret. Also, during the same year 160 acres of School Land was acquired by money furnished by Dave. Title was taken in the name of the plaintiff, but was later conveyed to the defendant. The "Dean Ranch" was a very profitable investment, netting $3,420.16 for the years 1937 to 1941, inclusive.

The first three years that the "Burnett Ranch" was operated after it was purchased from the bank, a loss aggregating $2,985.14 was sustained. Sam did not then assert any claim of partnership. In 1941, the price of wheat went up, and there was a bumper crop, resulting in a net profit of $1,308.20. The land was purchased for about $3.00 per acre. In 1941, it was worth $20.00 per acre. Sam remained on the place until the house burned in 1941. In that year Sam expressed a desire to "buy back" the ranch. Dave offered to sell it to him for $7,887.05, which represented the amount of money that Dave had in the ranch. Dave loaned Sam $20.00 to cover his expenses on a trip to Portland, where he went to secure the money to close the deal. Sam returned without being able to procure the money.

During all of the years since 1937, Dave hired all the men who worked on the Burnett and Dean ranches and paid them for their services. On August 17, 1938, Dave paid Sam $10.00 for some work on the ranch in banking 275 sacks of wheat, as shown by his check admitted in evidence.

At the time Sam says a partnership was created, he was 65 years of age and was broke. Dave permitted him to remain on the ranch after it was purchased from the bank. It is clear that Dave was a shrewd business man, and no doubt had often profited as a result of various transactions in which he and Sam were engaged. The more pertinent inquiry, however, is: Did Dave cheat or take undue advantage of his friend, who no doubt had implicit faith and confidence in him? We think he did not.

No check was ever drawn in the name of the partnership, nor was any bank account kept in such name. Dave sold the wheat crops whenever, in his judgment, it was the right time to do so. Sam had no voice in the matter. Sam never exercised any control over the actual management and operation of the ranch. The books kept by Dave show that the account relative to the "Burnett Ranch" was thus designated: "Burnett Ranch Account, New Account, D. L. Lemon." A separate account was kept in the name of "S. M. Burnett, Ranch Account."

Relative to the status of the plaintiff's account in May, 1937, when the "Burnett Ranch" was purchased, the record discloses the following on cross examination of the plaintiff:

"Q In other words, you knew the Burnett ranch was behind about $2,000.00 at the time Dave bought it in March '37?

"A Yes, I guess so.

"Q Wasn't it that you were behind that amount with Dave?

"A It was on the ranch.

"Q Dave didn't have any interest whatever in those ranches until he bought the Burnett ranch in March, '37, did he?

"A No.

"Q Then if those ranches were behind and the Burnett ranch was behind when he bought it in '37 to the tune of approximately Two thousand dollars, it was your debt, wasn't it?

"A Well, he said it was.

"Q And you knew it was, didn't you?

"A No, I didn't exactly know it was that much; I never could figure it out.

\*     \*     \*     \*

"Q \* \* \* You did not dispute his statement that the ranch had gone behind two thousand dollars?

"A No.

"Q And never did dispute it?

"A No."

Yet the plaintiff claims that according to his agreement with Dave, if he went on the ranch and took full charge of it, built the fences, took care of the stock, and did anything else necessary to be done in the operation of the ranch, Dave would "wipe the slate clean" and that they would be partners "from here on."

The defendant Lemon thus gives his version of the transaction:

"Q And in '38 what did he say to you about wanting to stay on the ranch, or having any place to go? What was the conversation at that time?

"A He said he didn't have any place to go and would like to stay there if he could, if I would let

him; he would be glad to take care of the fences, keep the stock out of the fields, and so on, and do a few little things around there; and I furnished him his board, because he didn't have any money to live on, until he could make some deals.

"Q What arrangement did you make with him then?

"A I told him we would do that, or I would do that,—I would let him stay there until he got able to get on his feet and get to going.

"Q And what arrangement did you make for his grocery bill?

"A Well, I arranged with the stores to charge the bill to me, and I would pay it.

\* \* \* \*

"Q Do you know how much you spent in that time, for his groceries?

"A I don't have that right in mind, but I believe it is in some of those exhibits, or in our answer to his complaint." (Note: The record shows that the grocery bill amounted to $731.85.)

■■ Aside from the testimony of the plaintiff relative to a partnership agreement with the defendant, the only evidence tending in the slightest degree to show such relationship is that concerning certain statements or declarations claimed to have been made by Dave wherein he referred to Sam as a partner. It was Sam who, in the absence of Dave, was doing most of the talking about the existence of a partnership. Such relationship cannot be established by self-serving declarations. There was no doubt some loose talk by Dave in referring to "our" crop—Dave also at times used the words "us" and "we" in discussing some of his farming operations—but we think there was no intention on the part of Dave to admit the existence of a partnership. Oral admissions are to be viewed with caution. In many instances the person testifying to

such alleged admissions may have misunderstood what was said and give a meaning completely at variance with what the party actually intended. Dave, however, denies that he ever called Sam his partner.

A letter from Dave to Sam, dated January 29, 1934, wherein reference was made to Morrison's cows running on "our crop," was introduced to show a partnership. How could it be reasonably contended that this letter established such fact, since there was no claim of the existence of a partnership in 1934?

The testimony of Victor W. Thompson, who went to the "Burnett Ranch" in the Spring of 1939 to see about some horses owned by Dave and Sam which they desired to sell, is relied upon to show a partnership. Thompson testified that Dave at that time and place said:

> "Sam and I are partners in all this, cows, horses, all this holdings here. Anything Sam does in regard to selling horses, it is all right with me, because we are in partnership."

■ On cross examination Thompson said that Dave's statement "Whatever Sam did was all right" pertained to horses. Dave denies making such statement, but at most we think this evidence fails to show a partnership covering the operation of the ranch or its ownership.

The work that Sam did on the ranch was not of such character as to warrant a reasonable inference therefrom that such work was considered by the parties as Sam's contribution to the partnership. There is testimony that Sam built two or three miles of fence on the "Dean Ranch" and that he also did some building and fence repairing on the "Burnett Ranch," but the other work in looking after a few head of stock

was of no great consequences. The sowing and cultivation of the ranches was all done by hired labor for which Dave paid. Is it probable that under such circumstances the defendant would "wipe the slate clean" and enter into a partnership agreement with the plaintiff whereby the latter would be entitled to share equally with him in the profits derived from the operation of these ranches, to say nothing about plaintiff's interest in the ownership of the land itself?

■ A partnership inter se can only be created as a result of an express or implied contract. There must be a meeting of the minds to establish such relationship. As said in *Willis v. Crawford,* 38 Or. 522, 63 P. 985, 64 P. 866, 53 L. R. A. 904:

"Whether the parties are partners inter se must be determined in a suit instituted for that purpose, from their intention to enter into that relation * * *."

In 40 Am. Jur. 156, § 43, it is said:

"In determining whether an actual partnership relation arises from or exists by virtue of a particular agreement, one of the most widely accepted tests applicable especially as between the parties themselves, irrespective of the rights of third persons, is whether it was the intention of the parties to be partners. As between the partners, partnership rests on mutual consent, which may be manifested by the terms of their agreement, the conduct of the parties to each other under it, or by the circumstances generally surrounding the transaction in question."

To the same effect see *First National Bank of Eugene v. Williams,* 142 Or. 648, 20 P. (2d) 222. That the existence of a partnership inter se depends upon the intention of the parties as determined by their agree-

ment or conduct, see *Marnon v. Vaughan Motor Co.,* 46 Oregon Advance Sheets 691, 194 P. (2d) 992; *Preston v. State Industrial Accident Commission,* 174 Or. 553, 149 P. (2d) 957; *Call v. Linn,* 112 Or. 1, 228 P. 127; Notes, 137 A. L. R. 97.

■ The burden of proof to establish that the parties hereto intended to create a partnership rests upon the party asserting the existence of such relationship. *Preston v. State Industrial Accident Commission,* supra, *H. H. Worden Co. v. Beals,* 120 Or. 66, 250 P. 375.

Here we are not concerned with a case wherein a third person is seeking to establish liability against a partnership by reason of the conduct of the alleged partners in holding themselves out to the public as having such relationship. The distinction between that case and the one under consideration is thus clearly stated in *Watson v. Hamilton,* 180 Ala. 3, 60 So. 63:

"On the question whether the parties are partners inter se, the interest of no third person being involved, stronger proof is required to establish the partnership than when the question arises as between the alleged partners and third persons. A partnership as to third persons may arise by mere operation of law against the parties by way of estoppel, etc.; but as between the parties themselves it only exists when such is their actual intention."

Also see *Call v. Linn,* supra.

The circuit court in its memorandum of opinion, relative to the question of intention, stated:

"It may be true that the defendant *never intended the arrangement to amount to a contract of partnership,* but—as one court said—both parties called it a partnership, treated the arrange-

ment as a partnership, and time and again referred to it as a partnership, and the Court in this case will have to take the defendant at his word.'' (Italics ours.)

If there was no intention to create a partnership, it would logically follow that there was no partnership inter se and plaintiff could not prevail in this suit.

While the evidence is conflicting on the question as to whether these parties intended to create a partnership relation, we are convinced that the plaintiff has failed to sustain the burden of proof on such issue. The extravagant claim of the plaintiff that the partnership agreement also extended to the ownership of the land tends to weaken his contention that he is entitled to share as a partner in the profits.

The decree of the circuit court is reversed and the cause is remanded with directions to dismiss the suit. Each party will pay his own costs and disbursements.