Argued May 4, affirmed in part and reversed in part June 12,
petition for rehearing denied September 10, 1953

# JEWELL *v.* HARPER

258 P. 2d 115
260 P. 2d 784

*P. J. Gallagher* argued the cause for appellant. On the brief were Gallagher & Gallagher, of Ontario, Oregon, and Vernon K. Smith of Boise, Idaho.

*E. Otis Smith* and *Max S. Taggart,* of Ontario, argued the cause and filed a brief for respondent.

Before LATOURETTE, Chief Justice, and WARNER, LUSK, TOOZE and PERRY, Justices.

PERRY, J.

This is a suit by the plaintiff on behalf of herself, individually, and as administratrix of the estate of William Jewell, deceased, against Goldie Mae Harper, individually as the widow, and as the administratrix of the estate of George Harper, deceased, to establish the existence of a partnership entered into between William Jewell, deceased, and George Harper, deceased, prior to their untimely deaths, and for an accounting; and, further, for relief in the nature of specific performance of an alleged oral contract to devise and bequeath the personal property, with the exception of the sum of $10,000, and all the real property owned by George Harper to William Jewell, and to have this property impressed with a trust in the hands of the defendant for the benefit of the plaintiff.

From an adverse decision upon each of these issues the plaintiff has appealed.

The complaint alleges in substance, that about June 30, 1946, George Harper proposed to William Jewell the formation of a partnership in his cattle ranching activities in Malheur county in eastern Oregon upon the following basis: That William Jewell and his wife should move to the ranch home of the said George Harper and devote their time and efforts to the operation of the ranch and the care of the livestock thereon; that George Harper would pay no wages, but would furnish all household supplies and expenses for William Jewell and his family, assist Jewell in acquiring cattle and permit him to run these acquired

cattle on the Harper range, with all expenses to be paid by Harper. That when William Jewell had acquired two hundred head of cattle of all kinds and ages, all personal property used in connection with the operation of the ranch, "together with the forage and emblements raised on said ranch", and all cattle of the parties should become partnership property and the parties thereafter would share equally therein.

That thereafter on or about Christmas Day, 1947, George Harper proposed that if William Jewell would not withdraw from the partnership, but would continue his efforts on its behalf, and would maintain a home and care for George Harper during his lifetime, or so long as he might direct, that George Harper would make a will bequeathing and devising all of the property of which he might die seised, except the sum of $10,000, to William Jewell. That a partnership was formed as agreed, but that George Harper failed to execute a will, or any will, in accordance with the agreement of the parties, although William Jewell had performed fully as was agreed and was entitled to have the contract enforced.

The defendant, Goldie Mae Harper, individually as the widow and sole heir at law, and as administratrix of the estate of George Harper, deceased, denied all the material allegations of the complaint.

The evidence discloses that the defendant, Goldie Mae Harper, and George Harper, deceased, were husband and wife at the time of George Harper's demise, having been married in the year 1929, although they had separated and had ceased to live together as husband and wife since in the latter part of December, 1933, she residing near McDermitt, in the state of Nevada, and he remaining on the ranch in Malheur county,

Oregon. That about the year 1934 William Jewell, then of the age of 16 or 17, a nephew of the defendant, came to the home of his aunt, and the following year was employed by George Harper at his ranch. He remained there until he was called into the armed service in January, 1942. While in service, William Jewell married the plaintiff and one child was born to this marriage. After his discharge, the Jewells returned from the east, where they had been residing, to the home of the defendant, remaining there for a short time and later moving to a home in McDermitt. For a period of five or six months thereafter William Jewell was employed in a service station and as a carpenter in and around McDermitt, at which time he was approached by Mr. Harper. The plaintiff testified to the following conversation at the Harper ranch about July 5, 1946:

"Q Who was at the ranch then?

"A Just George, Bill and I, and the baby.

"Q Did you have a conversation, the three of you there?

"A Yes.

"Q In which you started to discuss the proposition of Bill's coming out and living at the ranch?

"A Yes, we did.

"Q Can you relate that now?

"A Well, just the way George put it, as far as I can remember, he said 'Well, I'm putting the cards on the table, Bea. I have spoken to Bill about this proposition several times.' He said, 'I want Bill out here. I need him out here. You can come out here and live here, too. I can be as much help to you as you can be to me.'

"Q What reply, if any, did Bill make to that?

"A Bill didn't say anything as yet.

"Q What reply did you make, if any?

"A Well, I says, 'Well, I don't know anything

about the business, George.' I said, 'I don't know what good I'll be out here.' He says, 'Oh, you'll learn it.'

"" * * * * *

"Q (by Mr. P. J. Gallagher) This conversation, as I understand, was between you and Bill and George?

"A George—that's right.

"Q And I am asking you now what was said at a time when you were all three present. Give me the whole proposition. Did George outline any proposition there to Bill at that time?

"A Yes, because I know Bill kept saying he didn't want to work for wages, and George said, 'That isn't what I had planned. I want you to come out here and work with me and bring your cattle out here, and I will give you 30 heifers; and when you work these cattle up to 200 head, then I will take you in as a partner.' So then George said to me, 'How does it sound to you?' I said, 'Well, I don't know anything about it, but' I think it's a very good offer,' and I says, 'Well, Bill, how about you?' and he says, 'If you agree to it, all right.' I said, 'I don't want to think twice about it. If Bill agrees to it, I will say O.K.'

"Q What did Bill say?

"A He said, 'It's a deal,' and the three of us shook hands.

"Q Did you all shake hands on it?

"A Yeah."

Following the conversation related by the plaintiff, William Jewell immediately left his employment in McDermitt and took up the work at the Harper ranch. The house on the ranch was an old stone house and the living conditions were very primitive so that prior to Mrs. Jewell taking up residence at the ranch an addition was added and the house was made somewhat more liveable. Upon the plaintiff moving to the ranch,

George Harper and the Jewells lived as a family until the death of William Jewell and George Harper on February 3, 1949, their deaths resulting from the crash of an airplane which had been purchased by George Harper and William Jewell to be used in their business.

The plaintiff related that on Christmas Day, 1947, the following events and conversation took place between herself, William Jewell, and George Harper at the Harper ranch:

"Q  Where were you living at Christmas time in 1947?

"A  Baber place.

"Q  Will you relate what took place there on Christmas Day as to any conversations you had with George or what happened to the family that day?

"A  Well, it was just ordinary—what any family would have—a Christmas celebration.  Of course it was kind of a surprise to George.  We had gotten a tree and some Christmas decorations, and George and Susan had gone to bed early—

"Mr. E. O. SMITH:  If we can have the conversation, it will be fine.

"Q  (by Mr. P. J. Gallagher)  Will you go ahead and describe what you did Christmas Day?

"A  Well, when George got up in the morning he was quite surprised to see the Christmas tree.

"Q  What statements if any did he make?

"A  Well, he said, 'Susie, wake up.  Santa Claus has been here,' and he went over and grabbed her out of bed and he said, 'Well, I guess you thought Santa Claus forgot about you,' and he went in his room and brought out presents for all of us.

"Q  Did you have a little Christmas tree?

"A  Oh, yes, and a Christmas dinner.

"Q  Later did you have a Christmas dinner?

"A  Yes.

"Q Now was there any conversation that day or evening between you and Bill and George as to future disposition of George's property?

"A Yes.

"Q Will you relate that to the Court?

"A Well, after the Christmas celebration was over, Bill and I had gone in to bed, and the first thing you know George started knocking on the door and he asked us to come on out; and we wanted to know what it was and he said, 'Well, I want you kids to come on in here. I want to talk to you.' And he said, 'You know, this certainly has been the happiest year of my life,' and he wanted to know if we were satisfied and we said, 'Yes, of course,' then he says, 'Well, I know I am getting pretty well on in years and my health hasn't been too good. If you kids promise to stay on here and keep on as you have, when I make my will out, as long as Mamie, my sister, is taken care of, the rest of the property will go to you.'

"Q Then was that discussed back and forth at all, or did he ask you for a yes or no on it?

"A Well, he said—asked how we thought about it, and we said, 'Why, yes.'

"Q His statement to you was, 'If you stay here and do as you have been doing, when I make my will, after taking care of Mamie I will will the rest to you?'

"A Yes.

"Q Was that addressed to you and Bill?

"A Yes, sir.

"Q What did Bill say about accepting that proposition?

"A Well, he was very pleased about it.

"Q Can you tell me what he said?

"A He said, 'George, I didn't expect that, but'—he said it was more than he had expected.

"Q Now from that time on—that was Christmas Day, 1947—did you and Bill continue on and

perform your work about the same as you had been during the summer of 1947?

"A Yes, sir."

There were four cattle brands that were used for branding the cattle operated on the Harper ranch and range. They were the "Bar Double A", "Spear A", "B.J.", and "45". The "Bar Double A" and "45" brands were used by Harper to designate his cattle. His widow explained that the "45" brand was her own and that the cattle carrying that brand, except any that had been sold to her nephew, were hers, she having in the past obtained the increase of these cattle and the proceeds from their sale. The "Spear A" and "B.J." brands were registered to and used by William Jewell.

While there is evidence that George Harper in speaking to others of William Jewell spoke of him as his partner almost from the time that the Jewells moved to the Harper ranch, the evidence as exhibited by the records of the Boise Valley Livestock Commission Company, through which most of the cattle passed at auction sales into other hands, together with the bank accounts of George Harper, show that through 1947 and 1948 George Harper was selling a great many more cattle than was William Jewell, and was receiving the full monetary returns for these cattle without any division whatsoever to William Jewell. However, in November, 1948, George Harper represented to Walter Shaklee, an officer of the Western Idaho Production Credit Association of Caldwell, Idaho, while making arrangements to borrow money for the purchase of an airplane and a light plant, that he and Jewell were partners, William Jewell having an interest in his "Double A" cattle and the equipment upon the

ranch. By reason of this representation, the note and mortgage upon the cattle and other ranch property was signed by George Harper, William Jewell and the plaintiff. Mr. Shaklee testified as follows:

"Q Mr. Shaklee, I think you testified that you had the signatures of William R. Jewell and Beatrice Jewell on the note. Is that a fact?

"A Yes.

"Q And why did you require their signatures?

"A Well, in the first place, that's one of the major points that we watch. Anybody that's either connected with a loan in any shape or form, and especially labor—because a labor lien, we feel, comes ahead of a mortgage—so when he told me that Bill and him was running the ranch, I said, 'Does Mr. Jewell have an interest in these cattle?' He said, 'Yes, we're partners here. ['] I said, 'He'll sure have to sign the note, then.'

"Q Now what is the present condition of that loan today?

"A It's all paid off.

"Q Your organization has no further interest in the matter then, I take it?

"A None whatsoever."

Also, sometime the latter part of January, 1949, the cattle and personal property upon the ranch was for the first time assessed to Harper and Jewell by representation of the parties to the county assessor of Malheur county, Oregon, all previous assessments of record having listed the cattle and personal property as that of George Harper.

A partnership arises only from the intention of the parties to establish this relationship and, while it may be expressed or implied, there must be a meeting of the minds (*Burnett v. Lemon et ux.*, 185 Or 54, 199 P2d 910; *Willis v. Crawford*, 38 Or 522, 64 P 866, 63

P 985, 53 LRA 904); and the burden of proving the existence of such a relationship is upon the one alleging it. *Burnett v. Lemon et ux.,* supra; *Preston v. State Ind. Accident Com.,* 174 Or 553, 149 P2d 957; *H. H. Worden Co. v. Beals et al.,* 120 Or 66, 250 P 375.

■ The testimony of the plaintiff and the circumstances indicate quite clearly that William Jewell left his employment in and about McDermitt for the purpose of forming a partnership with George Harper at a time in the future. The defendant seriously contends that the partnership, however, was not to be established until such time as William Jewell had himself acquired 200 head of cattle of all kinds and ages, and since the evidence shows that at the time of his death he had acquired not more than 180 head of cattle carrying his brand, the condition attaching to the formation of the partnership was by him never met. This was a condition precedent that could be at any time waived by Harper, and the representations to the Western Idaho Production Credit Association and to the assessor are quite significant, for while the holding out to third persons that the parties are acting as partners is of but slight value as evidence of the intention of the parties to create a partnership, yet after the intention to create this relationship inter se is established, the subsequent action of the parties in holding themselves out as partners to third persons is strong evidence that the partnership agreement has been in fact consummated.

■ We are of the opinion that a partnership between George Harper and William Jewell existed at the time of their deaths.

The evidence, however, to establish the oral contract of George Harper to bequeath and devise his

property to William Jewell or the plaintiff is in our opinion insufficient.

■ The oral agreement relied upon by the plaintiff provides a single consideration for both a bequest of personal property and a devise of the real estate of the deceased, George Harper. Such an agreement is not severable so as to be enforceable against the personal property of the estate and nonenforceable as to the real property, hence all property sought to be recovered is treated as realty and lying within the prohibition of the statute of frauds requiring that the contract to convey must be in writing. *Howland v. Iron Fireman Mfg. Co.*, 188 Or 230, 215 P2d 380, 213 P2d 177; *Banks v. Crow,* 3 Or 477. See also cases cited in 71 ALR 485, note b.

■ The relief prayed for in this respect is in the nature of specific performance and is not a matter of right, but is granted by courts of equity in the exercise of their sound judicial discretion to prevent the perpetration of a fraud upon one who in good faith has performed services upon the oral promise of another although the oral agreement is unenforceable in law because within the statute of frauds. *Majovski et al. v. Slavoff et al.,* 188 Or 357, 215 P2d 674; *Tigglebeck v. Russell et al.,* 187 Or 554, 213 P2d 156.

■ The acts of performance relied upon must be such that they would not have been done except for the contract of the parties, that is, the acts of performance must be exclusively referable to the oral contract of the parties. *Howland v. Iron Fireman Mfg. Co.,* supra; *Dodge et al. v. Davies et al.,* 181 Or 13, 179 P2d 735; *Hunter v. Allen,* 174 Or 261, 148 P2d 936, 147 P2d 213; *Brennen v. Derby et al.,* 124 Or 574, 265 P 425; *Brown v. Lord,* 7 Or 302.

■ Thus the statements attributed to George Harper on that Christmas night in 1947 and relied upon by the plaintiff as a contract to devise the realty and bequeath the personalty of George Harper, deceased, presents no new responsibility upon any of the parties. The relationship before and after this statement was the same. Each party was at that time carrying the same burdens and duties, looking forward to the establishment of a partnership relation, and all acts were referable back to the original agreement of the parties to establish this partnership. *Hillman v. Young,* 64 Or 73, 87, 129 P 124, 127 P 793.

The most that can be said of the plaintiff's position as to this matter, considering all of the circumstances surrounding the making of the purported agreement and the agreement itself, was that George Harper, pleased and happy at being adopted into the pleasant surroundings and season festivities of the Jewell household, and in appreciation thereof, desired to confer upon them a benefit arising out of his affection. "* * * Motive is not the same thing with consideration." *Thomas v. Thomas,* 2 QB 851. And if there is no consideration other than that motivated by love and respect or affection for another, it will not support a promise. 12 Am Jur, Contracts, 569, § 78; 1 Restatement, Contracts, 80, ch. 3, § 75.

We are of the opinion, gathered from all of the circumstances of this case, that a partnership with equal ownership in all the partnership property therein was consummated by George Harper and William Jewell prior to their untimely deaths, and that this matter should be remanded for an administration of the partnership property according to law and for an accounting.

We are further of the opinion that there was not an enforceable agreement by George Harper to devise and bequeath his property at his death to William Jewell or to the plaintiff.

This cause is, therefore, affirmed in part and reversed in part for further proceedings consistent with this opinion.

PETITION FOR REHEARING

*E. Otis Smith* and *Max S. Taggart,* of Ontario, for the petition.

*Gallagher & Gallagher,* of Ontario, and *Vernon K. Smith* of Boise, Idaho, contra.

Before LATOURETTE, Chief Justice, and WARNER, LUSK, TOOZE and PERRY, Justices.

PETITION DENIED.

PERRY, J.

The defendant has petitioned this court for a rehearing upon the merits upon the premise that the deductions of the court drawn from the evidence are erroneous and insufficient to sustain our finding of the existence of the copartnership relationship between William Jewell and George Harper, both now deceased.

After a careful review of the record, this court was then, and is now, satisfied that such a relationship between the parties did exist in November of 1948.

However, so that no misunderstanding may exist, we wish to clarify our opinion wherein we stated "that a partnership with equal ownership in all the partnership property therein was consummated by George Harper and William Jewell." By the language used this court did not intend to determine the rights of

the parties in and to the capital assets of the dissolved copartnership, which fact can be determined only upon the accounting to be had, but only that they were equal partners in the copartnership in the sharing of its profits as it existed prior to its dissolution by the death of both partners.

The plaintiff is entitled to her costs and disbursements in this court. However, respondent's objection to appellant's cost bill for the transcript of testimony in the sum of $321.75 should be sustained and reduced to the proper amount of $193.05, since the cost of a carbon copy thereof is not properly taxable or allowable as only one transcript of testimony is necessary for the record on appeal. *Bell v. Spain et al.,* 110 Or 114, 222 P 322, 223 P 235.

With this correction the cost bill as filed shall stand.

The petition for rehearing is denied.