Argued and submitted April 20, 2009, reversed and remanded April 14, petition
for review denied August 18, 2010 (348 Or 669)

David B. WIRTH
and Diana R. Wirth,
*Plaintiffs-Respondents,*

*v.*

SIERRA CASCADE, LLC,
an Oregon limited liability company;
and its sole member
Dana Van Pelt,
*Defendants-Appellants.*

SIERRA CASCADE, LLC,
an Oregon limited liability company,
*Third-Party Plaintiff,*

*v.*

C. B. FOSS.,
an individual;
Pat Schafner, an individual,
dba South Central Pumice;
and Does 1-10,
*Third-Party Defendants.*

Klamath County Circuit Court
0604364CV; A136617

230 P3d 29

George W. Kelly argued the cause and filed the briefs for appellants.

Charles F. Hinkle argued the cause for respondents. With him on the brief were Andrew R. Gardner and Stoel Rives LLP.

Before Wollheim, Presiding Judge, and Brewer, Chief Judge, and Sercombe, Judge.*

SERCOMBE, J.

Wollheim, P. J., concurring.

---

\* Brewer, C. J., *vice* Edmonds, P. J.

## SERCOMBE, J.

This case arises from a dispute between plaintiffs David and Diana Wirth and defendants Sierra Cascade, LLC and Dana Van Pelt over the ownership of certain mineral rights, including the right to mine pumice, in the approximately 28,000 acres of land that comprise the "Liskey Estate Tract" (the tract) in Klamath County.[1] Plaintiffs filed a declaratory judgment action to determine the scope of defendants' interest in the tract mineral rights and, specifically, whether defendants' interest was limited to the mineral rights in an approximately 180-acre parcel that had been conveyed to defendants by a quitclaim deed. Defendants responded with eight counterclaims that, among other things, sought to establish that the parties had entered into an oral partnership agreement to mine the entire tract. The trial court granted plaintiffs summary judgment on their declaratory judgment claim, dismissed with prejudice defendants' eight counterclaims, and entered a limited judgment from which defendants appeal.[2]

We conclude that defendants presented sufficient evidence on summary judgment to create a genuine issue of material fact as to whether there was an oral partnership agreement between the parties concerning the tract, and that evidence of that agreement was admissible notwithstanding the statute of frauds and the parol evidence rule. Accordingly, we reverse the grant of summary judgment on plaintiff's declaratory judgment claim and the dismissal of defendants' eight counterclaims.

## I. PROCEDURAL HISTORY

Plaintiffs, the record owners of the mineral rights in the tract, filed a complaint seeking a declaratory judgment that defendants' interests in those mineral rights are

---

[1] Plaintiffs now refer to the "Liskey Estate Tract" as the "Wirth Mineral Reservation." For purposes of this opinion, we refer to the property as the "Liskey Estate Tract" or "tract," which is how the property is referenced in the initial pleadings.

[2] The limited judgment resolved only the claims between plaintiffs and defendants; it did not resolve defendants' remaining third-party claims. Those claims were later dismissed by the trial court in a stipulated judgment of dismissal, which is not at issue on appeal.

expressly limited to those mineral rights in an approximately 180-acre parcel conveyed to defendants by a November 2001 quitclaim deed.[3] Defendants answered and pleaded eight counterclaims for breach of a partnership agreement, breach of fiduciary duty, establishment of a constructive trust, *quantum meruit*, misappropriation of trade secrets, intentional interference with business relationships, injunctive relief, and an accounting. All of defendants' counterclaims alleged an oral partnership agreement, an oral contract, or a "special relationship" between the parties that created legal obligations beyond those stated in the November 2001 quitclaim deed. Defendants claimed that an oral partnership agreement provided that they would be the exclusive development, mining, and sales operator for the entire 28,000 acres of the tract.

Plaintiffs moved, pursuant to ORCP 47 C, for summary judgment on their claim for declaratory relief and for dismissal of defendants' counterclaims. Plaintiffs contended that no reasonable factfinder could conclude that there was a partnership agreement between the parties involving the entire tract or any part of it, that the statute of frauds bars proof of defendants' counterclaims, that defendants cannot vary the terms of the November 2001 quitclaim deed with parol evidence, and that all of defendants' counterclaims should be dismissed because they depended on the existence of a partnership agreement. Defendants objected to the motion and argued that there were questions of material fact concerning the existence of a partnership, that neither the statute of frauds nor the parol evidence rule was applicable in this case, and that plaintiffs had failed to satisfy their burden on summary judgment regarding the second through eighth counterclaims because those counterclaims do not rely on the existence of a partnership agreement for recovery.

The trial court concluded that no oral partnership existed between the parties and that there were insufficient

---

[3] The record contains slightly different estimates of the size of the property covered by the November 2001 quitclaim deed. Those differences are not material to the issues involved in this case. In addition, the November 2001 quitclaim deed covered property in several separate areas. For our convenience, we refer to the property containing the mineral interests conveyed by the November 2001 quitclaim deed as the "180-acre parcel."

facts about the existence of an oral partnership agreement to create a jury question on that issue. In addition, the trial court determined that the alleged oral partnership agreement was subject to the statute of frauds and unenforceable, because it was dependent on a promise by plaintiffs to transfer their interest in the tract to defendant Sierra Cascade. Moreover, the trial court concluded that evidence of an oral partnership agreement was barred under the parol evidence rule. The trial court ultimately declared that defendants have no right, title, interest, or claim to any mineral rights within the tract, except for those expressly conveyed by the November 2001 quitclaim deed. The court then dismissed with prejudice defendants' eight counterclaims for failing to state a claim from which relief can be granted.

## II. STANDARD OF REVIEW

Defendants make the same contentions on appeal as they did in the summary judgment proceedings. In their first assignment of error, defendants argue that the trial court erred in granting summary judgment on plaintiffs' declaratory judgment claim, because evidence in the record shows genuine issues of material fact on the existence of a partnership agreement and both the statute of frauds and the parol evidence rule are inapplicable. In their second assignment of error, defendants assert that the trial court erred in dismissing their counterclaims on summary judgment, because the second through eighth counterclaims were not premised on the existence of a partnership agreement and were supported by the summary judgment record.

In reviewing a grant of summary judgment, we view the record and all reasonable inferences that may be drawn from it in the light most favorable to the nonmoving party, here defendants, to determine whether there is any genuine issue of material fact and whether the moving party is entitled to judgment as a matter of law. No genuine issue of material fact exists if no objectively reasonable juror could return a verdict for the nonmoving party. ORCP 47 C.[4] In

---

[4] ORCP 47 C, which governs motions for summary judgment, provides, in relevant part:

"The court shall grant the motion if the pleadings, depositions, affidavits, declarations and admissions on file show that there is no genuine issue as to any

other words, "a moving party is entitled to summary judgment if, on the record before the court, the adverse party 'would not be entitled to a jury determination.'" *Jones v. General Motors Corp.*, 325 Or 404, 414, 939 P2d 608 (1997) (quoting *Seeborg v. General Motors Corporation*, 284 Or 695, 701, 588 P2d 1100 (1978)).

At the same time, the nonmoving party "has the burden of offering admissible evidence to create a genuine issue of material fact 'on any issue raised in the motion as to which the [nonmoving] party would have the burden of persuasion at trial.'" *O'Dee v. Tri-County Metropolitan Trans. Dist.*, 212 Or App 456, 463, 157 P3d 1272 (2007) (citations omitted). We state the relevant facts and evaluate the summary judgment motion in accordance with those standards.

## III. HISTORICAL FACTS

In 1999, defendant Sierra Cascade operated a pumice mine in Chemult, Oregon, on property adjacent to the 28,000-acre tract. At that time, Sierra Cascade was co-owned in equal shares by defendant Van Pelt and Janie Erkiaga. Sierra Cascade sought to expand its mining operations and discovered that the mineral rights in the neighboring land had been owned by Liskey, who had died in 1997. In early 2000, Van Pelt began negotiations on behalf of Sierra Cascade with Liskey's surviving family members—Maxine Wirth, David Wirth, and Diana Wirth—concerning the purchase of the mineral rights in the tract.[5] During those negotiations, Van Pelt learned that Liskey's estate had not been probated and that plaintiff David Wirth was the sole heir to the mineral rights.

---

material fact and that the moving party is entitled to prevail as a matter of law. No genuine issue as to a material fact exists if, based upon the record before the court viewed in a manner most favorable to the adverse party, no objectively reasonable juror could return a verdict for the adverse party on the matter that is the subject of the motion for summary judgment. The adverse party has the burden of producing evidence on any issue raised in the motion as to which the adverse party would have the burden of persuasion at trial. The adverse party may satisfy the burden of producing evidence with an affidavit or a declaration under section E of this rule."

[5] Maxine Wirth is not a party to this litigation. She is Liskey's surviving daughter. David Wirth, who is Maxine Wirth's son, is married to Diana Wirth.

From August to December 2000, Sierra Cascade sent six written proposals to the Wirth family concerning the tract. Under the first four of those proposals, Sierra Cascade would have received the mineral rights in the entire tract. Under the last two of those proposals, Sierra Cascade would have received the mineral rights in only a limited portion of the tract. In December 2000, David Wirth sent Sierra Cascade a seventh written proposal by which Sierra Cascade would have received reserved mineral rights in approximately 100 acres of the tract. None of those seven written proposals was ever adopted by the parties.

Van Pelt averred, however, that, in the first part of 2000, he and plaintiffs orally agreed that they would form a business venture between Sierra Cascade and plaintiffs that was in the nature of a partnership. According to defendants' responsive pleading, plaintiffs agreed to contribute to the partnership their interest in the mineral rights of the tract. Van Pelt's declaration explains that plaintiffs wanted to deed mineral rights in smaller sections of the tract to Sierra Cascade as they became needed so that plaintiffs could protect themselves from risks created by Sierra Cascade's mining activities.

The terms of the parties' oral agreement regarding the development of the tract, as described by Van Pelt, specifically provided: (1) Sierra Cascade would provide investment money to pay development costs, purchase equipment and machinery, and initiate litigation to clear and confirm title to the tract in plaintiffs; (2) Sierra Cascade would pay attorney fees associated with probating the tract; (3) Sierra Cascade would develop, operate, mine, remove, market, and sell the pumice from the tract and would provide the requisite know-how, skill, services, and confidential information for those purposes; (4) Sierra Cascade would pay plaintiffs a percentage of the gross sales of the pumice mined from the tract; (5) Sierra Cascade would be responsible for the daily operations of the partnership; (6) plaintiffs and Sierra Cascade would jointly develop the long-term strategic plan for developing the tract; (7) plaintiffs would allow Sierra Cascade to be the exclusive development, mining, and sales operator for the tract; and (8) plaintiffs would cooperate with Sierra Cascade in obtaining needed licenses and permits and

in all things reasonably needed to mine the tract. After making the alleged oral agreement, plaintiffs referred to Van Pelt as their "partner" on numerous occasions.

According to Van Pelt, he and plaintiffs determined that the development project would occur in two phases. The first phase was to involve 3,000 acres and the second phase 5,000 acres. Van Pelt designated the parcels of the tract that he wanted to acquire for the mining operation. The parties detailed the development plan on several maps, at least one of which was owned and kept by Sierra Cascade. Erkiaga was not involved in the discussions between Van Pelt and plaintiffs during which agreements were reached concerning the development of the tract, nor was she later told by Van Pelt that he had negotiated such an agreement on behalf of Sierra Cascade.

Around April 2000, Van Pelt and David Wirth attended a Klamath County Planning Commission hearing on a conditional use permit application by an adjoining landowner. At that meeting, Van Pelt publicly represented that Sierra Cascade had the exclusive right to develop the 27,000 acres of the tract. David Wirth corrected Van Pelt's statement as to the tract's size, advising the commission that the tract was actually 28,000 acres.

David Wirth eventually initiated the probate proceeding to obtain title to the mineral rights in the tract. Sierra Cascade paid in excess of $5,000 in attorney fees that were incurred by Wirth in the probate proceeding. In July 2001, David Wirth received out of probate the title to the mineral rights in the tract. He then conveyed those rights by quitclaim deed to himself and Diana Wirth as tenants in common; they recorded their deed on July 22, 2001, in Klamath County.

Later that year, plaintiffs conveyed to Sierra Cascade by quitclaim deed, dated and recorded on November 8, 2001, the mineral rights in several separate portions of the tract, comprising approximately 180 acres. The conveyance was not to a partnership entity of plaintiffs and defendants, nor did the conveyance mention the existence of a partnership between the parties. In exchange for the conveyance, plaintiffs received $3,000, a royalty of eight percent of Sierra

Cascade's gross proceeds from the sale of mineral products mined and sold from the 180-acre parcel or 70 cents per ton of mineral products mined, whichever is greater, and "other value given or promised which was the whole consideration."

In January 2002, Van Pelt hired an employee to begin developing a market for the pumice from the tract. That employee worked closely with Diana Wirth on the marketing program and went over all the brochures, advertising boards, and website marketing materials with her. Diana Wirth approved the marketing materials used by Sierra Cascade. Those materials indicated that Sierra Cascade had the "Largest Pumice Reserves in the nation" and "exclusive mining rights near Chemult, Oregon."

In March 2002, Sierra Cascade filed a conditional use permit application to allow pumice mining on a portion of the tract. The application initially covered the 180-acre parcel and an additional 70 acres. The April 23, 2002, hearing on the application was attended by Van Pelt, David Wirth, and an attorney for U.S. Timberlands, the owner of surface rights to the tract. The U.S. Timberlands attorney testified at the hearing that it might be premature to proceed on Sierra Cascade's application because of U.S. Timberlands' concern that three-eighths of the tract's mineral rights might not be owned by plaintiffs. Wirth testified in response and began by stating that he and Diana Wirth had "sold the mineral rights for a royalty on so many acres, not all of it but so many acres, to Sierra Cascade." Wirth argued that his title to the tract was not clouded. A representative of the Department of Geology and Mineral Industries (DOGAMI) indicated at the hearing that the department would not accept a single application for separate mining sites. Sierra Cascade thereafter filed an amended conditional use permit application that included only approximately 80 acres of the 180-acre parcel. A permit on the amended application was granted on May 31, 2002.

In August 2002, plaintiffs wrote a letter to Van Pelt, asking that Van Pelt stop representing that Sierra Cascade owned plaintiffs' mineral reservation. Van Pelt saw that letter for the first time in 2006, when it was attached to a letter sent by plaintiffs' attorney. Also during 2002, a dispute arose

between Van Pelt and his Sierra Cascade co-owner, Erkiaga. During that time, Erkiaga turned over Sierra Cascade's development maps of the tract to Diana Wirth. In addition, Diana Wirth began to assert that Sierra Cascade's interest in the tract was limited to the mineral rights in the 180-acre parcel. Eventually, by December 2002, Van Pelt had purchased all of Erkiaga's interest in Sierra Cascade, becoming its sole owner.

In 2003, Sierra Cascade settled litigation with U.S. Timberlands. That litigation involved claims against Sierra Cascade by U.S. Timberlands that sought, among other things, to enjoin Sierra Cascade from mining the 80-acre parcel pursuant to its conditional use permit without first obtaining a mining permit from DOGAMI. The litigation also involved claims against U.S. Timberlands by Sierra Cascade regarding the mining rights to 2,800 acres of land in the vicinity of the tract. According to Van Pelt, Sierra Cascade settled the litigation to reach an agreement on the three-eighths mining interest issue raised at the April 2002 conditional use permit hearing and to obtain all of the surface access rights to the mineral mining of the tract, as well as U.S. Timberlands' agreement not to oppose any DOGAMI applications on the tract. As a result of that litigation, Sierra Cascade incurred more than $220,000 in attorney fees. Sierra Cascade obtained a DOGAMI permit in 2003.

That same year, Van Pelt asked plaintiffs to execute a writing detailing the oral agreement from 2000 and confirming that plaintiffs had agreed that defendants would develop the entire 28,000 acres of the tract. Plaintiffs sent Van Pelt a letter in March 2003, which stated:

"The mineral right that Sierra Cascade owns, is part of the vast * * * Liskey mineral right encompassing some 28,000 contiguous acres in south central Oregon. A large portion of this land is underlaid with pumice * * * as a consequence of Mt. Mazama's cataclysmic eruption.

"* * * * *

"This pumice deposit is very significant in the national inventory of mineral materials. [A representative] of the USGS (United States Geological Survey) has stated that it may be one of the largest deposits in North America.

"* * * * *

"The * * * Liskey mineral right is currently owned by Dave and Diana Wirth * * *. Mr. Dana Van Pelt and Sierra Cascade enjoy our trust and commitment to the development of this resource."

With plaintiffs' knowledge and agreement, Van Pelt shared that letter with Sierra Cascade customers. In 2004, Sierra Cascade actively mined the 180-acre parcel and began paying royalties to plaintiffs. In late 2004 and early 2005, plaintiffs made demands on Van Pelt that Sierra Cascade increase its operations capacity and purchase additional equipment.

## IV. PARTNERSHIP CREATION

Plaintiffs' requested declaratory relief was based on the recorded title to the tract. Defendants defended against the declaratory judgment claim and asserted a counterclaim alleging that they had rights in the tract under a partnership agreement that were not reflected in the recorded title. We begin our analysis by determining whether defendants produced sufficient evidence on summary judgment in order to create a genuine issue of material fact as to whether there was an oral partnership agreement between the parties concerning the entire tract.

A. *Law governing partnership creation*

ORS 67.055 governs the creation of partnerships and provides, in relevant part:

"(1) * * * [T]he association of two or more persons to carry on as co-owners a business for profit creates a partnership, whether or not the persons intend to create a partnership.

"* * * * *

"(4) In determining whether a partnership is created, the following rules apply:

"(a) Factors indicating that persons have created a partnership include:

"(A) Their receipt of or right to receive a share of profits of the business;

"(B) Their expression of an intent to be partners in the business;

"(C) Their participation or right to participate in control of the business;

"(D) Their sharing or agreeing to share losses of the business or liability for claims by third parties against the business; and

"(E) Their contributing or agreeing to contribute money or property to the business.

"* * * * *

"(c) The sharing of gross returns does not by itself create a partnership, even if the persons sharing them have a joint or common right or interest in property from which the returns are derived.

"(d) It is a rebuttable presumption that a person who receives a share of the profits of a business is a partner in the business, unless the profits were received in payment of [certain enumerated factors].

"* * * * *

"(e) An agreement to share losses by the owners of a business is not necessary to create a partnership."

In addition, ORS 67.020(1) provides, "Unless displaced by particular provisions of this chapter, the principles of law and equity supplement this chapter."

ORS 67.055 and ORS 67.020 were enacted by Senate Bill (SB) 268 (1997) and became effective on January 1, 1998. Or Laws 1997, ch 775, §§ 4, 7, 103. The partnership at issue in this case was allegedly created in 2000, after the effective date of SB 268.[6] Thus, its creation is governed by ORS 67.055

---

[6] Before January 1, 2003, however, those statutes initially governed only (1) limited liability partnerships; (2) foreign limited liability partnerships; (3) partnerships created on or after January 1, 1998, unless the partnership was continuing the business of a dissolved partnership; and (4) partnerships created before January 1, 1998, if the partnership elected to be governed by the statutes. Since January 1, 2003, ORS 67.055 and ORS 67.020 have governed all partnerships. Or Laws 1997, ch 775, § 84.

and, pursuant to ORS 67.020, any supplemental principles of law and equity that have not been displaced by the provisions of ORS 67.055.

Defendants rely only on the application of ORS 67.055 in support of their argument that they have produced sufficient evidence for a jury to find that a partnership agreement existed. In contrast, plaintiffs rely only on preexisting case law and neglect to consider the application of ORS 67.055 in support of their argument that defendants failed to produce sufficient evidence to show a partnership agreement. Defendants, in their reply brief, contend that plaintiffs' argument "uses case law that [ORS 67.055] has replaced." Before determining whether defendants have met their burden on summary judgment, we must first determine what law governs that inquiry. That requires a determination of the extent to which the enactment of ORS 67.055 displaced the prior case law governing partnership creation.

### 1. *Prior case law governing partnership creation*

The case law concerning the creation or existence of a partnership was developed under Oregon's Uniform Partnership Law, originally enacted in 1939 and codified as ORS 68.010 to 68.650. *See* Or Laws 1939, ch 550. When the new statutory provisions governing partnerships were enacted in 1997 by SB 268—including ORS 67.055—the Uniform Partnership Law was repealed. *See* Or Laws 1997, ch 775, §§ 100, 101 (repeal of ORS 68.010 to 68.650 operative as of January 1, 2003).[7] While in effect, the Uniform Partnership Law defined a partnership as "an association of two or more persons to carry on as co-owners a business for profit." Or Laws 1939, ch 550, § 6(1). The rules for determining the existence of a partnership provided, in relevant part:

> "3. The sharing of gross returns does not of itself establish a partnership, whether or not the persons sharing them have a joint or common right or interest in any property from which the returns are derived.

---

[7] The Uniform Partnership Law was amended at various times before its repeal by SB 268. However, because those amendments are not material to our discussion, we cite the Uniform Partnership Law as originally enacted.

> "4. The receipt by a person of a share of the profits of business is prima facie evidence that he is a partner in the business, but no such inference shall be drawn if such profits were received in payment [of certain enumerated factors]."

Or Laws 1939, ch 550, § 7.

As compared with current law, the Uniform Partnership Law provisions governing partnership existence made no mention of "[f]actors indicating that persons have created a partnership." *Compare* ORS 67.055(4)(a). Nor did the Uniform Partnership Law provisions address the quantity or quality of the evidence that would sufficiently indicate whether a partnership existed or whether there was a jury question on that issue. Instead, case law developed that addressed those issues.

In *Preston v. State Ind. Accident Com.*, 174 Or 553, 555-56, 149 P2d 957 (1944), the court reviewed a judgment for the defendants, entered after a directed verdict, that presented a single question for the court's determination: whether there was a logging partnership between two brothers named Maden, as had been alleged by the plaintiff. The court noted, "Partnership is never presumed, hence the burden of establishing the partnership is upon the party who alleges it." *Id.* at 562 (citations omitted). Further, the court explained that, "[i]f there was any substantial evidence of the existence of a partnership, a jury question would be involved." *Id.* (citation omitted). The plaintiff's evidence before the trial court indicated that J. H. Maden performed acts that partners also do, but that his conduct taken in its entirety was also consistent with him merely extending financial assistance to his brother, J. B. Maden. *Id.* at 561. The court determined that any profits J. H. Maden received from the logging enterprise were in partial payment of a debt, that there was no substantial evidence of joint authority or right to administer the business, and that there was no actual intent to form a partnership. *Id.* at 566. The court stated:

> "The mere introduction in evidence of some conduct which is consistent with the existence of a partnership, but

equally consistent with its nonexistence, does not necessarily raise an inference of partnership when the burden of proof is upon the plaintiff. In its most favorable aspect, the plaintiff's evidence rises only to the level of bare speculation."

*Id.* Thus, the court affirmed the judgment, "[b]eing of the opinion that there was no substantial evidence of partnership[.]" *Id.* at 567.

In *Burnett v. Lemon et ux.*, 185 Or 54, 55-56, 199 P2d 910 (1948), the court reviewed a decree entered by the trial court after a hearing on the merits that found that the oral partnership agreement alleged by the plaintiff existed between the parties.[8] In resolving the appeal, the court stated that "the existence of a partnership * * * depends upon the intention of the parties[.]" *Id.* at 64. The court also concluded that stronger evidentiary proof of a partnership is required in cases where an alleged partner is asserting the partnership's existence than in cases where a third party has made that assertion. *Id.* at 65 (quoting with approval the explanation from *Watson v. Hamilton*, 180 Ala 3, 60 So 63 (1912), distinguishing between the two types of cases). The court additionally held that a party's own subjective statements of ultimate fact—*i.e.*, "self-serving declarations"—are insufficient proof of a partnership when the party making the statements is also the party asserting the existence of the partnership. *Id.* at 62 ("It was [the plaintiff] who, in the absence of [the defendant], was doing most of the talking about the existence of a partnership. *Such relationship cannot be established by self-serving declarations.*" (Emphasis added.)). Ultimately, the court reversed the decree by the trial court and held that the plaintiff had failed to sustain his burden of proof as to the existence of the alleged partnership agreement. *Id.* at 66.

In *Hayes v. Killinger,* 235 Or 465, 385 P2d 747 (1963), the court elaborated on the principles of law announced in earlier precedent. It stated: "The *essential test* in determining the existence of a partnership is whether the parties intended to establish such a relation." *Id.* at 471 (emphasis added). The court went on to provide that, "[i]n the

---

[8] Although not explicitly stated in *Burnett*, the court's review of the decree in that case was *de novo*.

absence of an express agreement codifying the relationship, the status may be inferred from the conduct of the parties in relation to themselves and to third parties." The court indicated that, when considering the parties' conduct to determine whether a partnership exists, "the entire factual setup must be examined as a whole" and that "no one factor is absolutely determinative." Nonetheless, the court noted that, "when faced with the intricate transactions that arise, [the] court looks mainly to the right of a party to share in the profits, his liability to share losses, and the right to exert some control over the business. Those are deemed the earmarks of a partnership." *Id.* (citations omitted). The court later reiterated that "[j]oint control as well as an agreement to share the profits and losses is generally essential to a * * * partnership." *Id.* at 477 (citations omitted).

In *Hayes*, the plaintiff had alleged that four defendants—Wallace and three individuals named Killinger—should be held jointly and severally liable as joint adventurers for injuries the plaintiff sustained while operating the Killingers' corn-picking machine on Wallace's farm.[9] *Id.* at 467. The Killingers settled with the plaintiff before trial, and the plaintiff proceeded against Wallace individually on the theory of joint and several liability. *Id.* at 469. At the close of the plaintiff's case-in-chief, the trial court sustained Wallace's motion for an involuntary nonsuit—what is now called a directed verdict—on the ground that the record contained no evidence of a joint venture between Wallace and the Killingers. *Id.* at 467.

On appeal, the court viewed the evidence in the light most favorable to the plaintiff, the party opposing the motion. *Id.* at 470. Besides owning the farm where the plaintiff's injury occurred, Wallace was engaged by the Killingers to assist them in their corn-picking operation by providing a truck to haul the corn. The alleged joint venture between Wallace and the Killingers was not based on any express

---

[9] A partnership is usually formed for the transaction of general business of a particular kind, whereas a joint venture is usually formed for the purpose of a single transaction. "[T]he rules applicable in determining the existence of a partnership form the criteria of existence of a joint adventure." *Hayes*, 235 Or at 470-71 (citations omitted).

partnership agreement. *Id.* at 467-69. Thus, the court proceeded to examine the parties' conduct and course of dealing under the three "earmarks of a partnership." *Id.* at 472-80. The court found that (1) Wallace received a portion of gross receipts, not net profits, as compensation for his services in hauling corn; (2) Wallace's exposure to loss was limited to loss from uncollected debt owed to the Killingers; and (3) there was scant indication that Wallace exerted any control in the enterprise. *Id.* at 473-74, 476, 478. The court ultimately sustained the judgment of involuntary nonsuit, concluding, "The case at bar does not, in our opinion, reveal such an amalgam of funds, of property, of skills, of risks, of control or of interest as would create a joint adventure. The minds of reasonable men would coalesce, we believe, in this view." *Id.* at 480.

Relying on *Burnett* and *Hayes*, we stated in *Oshatz v. Goltz*, 55 Or App 173, 176, 637 P2d 628 (1981):

"A mere community of interest, such as the right to share in profits as compensation for services rendered, does not make one a partner; the right to share in profits must result from part ownership of the business. The [party alleging the partnership] must prove, among other things, that the parties mutually intended to enter into such a relationship. Where the alleged agreement was oral, the court must look primarily to the parties' conduct and course of dealing to determine whether a partnership was formed. Self-serving declarations of a party are not sufficient."

(Citations omitted.)

In *Oshatz*, we reviewed *de novo* the trial court's finding that there was no partnership between the parties. *Id.* at 175. The plaintiff alleged an oral partnership concerning the acquisition of real property. *Id.* Besides evidence that the plaintiff performed particular services and paid certain costs, the plaintiff's evidence in support of finding the existence of a partnership consisted "primarily of his own testimony as to what he and defendant agreed upon[.]" We concluded that "that is not enough to prove the existence of a partnership." *Id.* at 177-78 (citation omitted). We held that the plaintiff failed to carry his burden of proof that the parties intended to

form a partnership and were co-owners of the disputed property. *Id.* at 178.

Later precedent developed along the same lines. *See, e.g., Martin v. Martin,* 77 Or App 226, 232, 712 P2d 820, *rev den,* 300 Or 722 (1986) (partnership established where parties agreed they would share profits, expenses, control over the business, and ownership of any acquired equipment or supplies); *Susitna Ltd. v. Pacific First Federal,* 118 Or App 126, 130, 846 P2d 438 (1993) (no joint venture established where no joint ownership of property, no profit-sharing— merely an agreement to share gross returns, and no alleged agreement to share losses or to exert joint control over the business).

### 2. *The displacement of prior case law by ORS 67.055*

To briefly review, then, case law that developed under the Uniform Partnership Law addressed two main issues. The first was the identification of characteristics that indicated the existence of a partnership between the parties, *i.e.,* the parties' actual intent and their conduct in sharing profits, sharing losses, and exercising joint control over the business. The second issue addressed by the case law was the establishment of certain evidentiary standards to be used in cases where the existence of a partnership is at issue, *i.e.,* which party bears the burden of proof, the need for substantial evidence of a partnership before a jury question arises, the failure of evidence equally consistent with the existence and nonexistence of a partnership to necessarily raise an inference of partnership, and the insufficiency of self-serving declaration evidence to prove, on *de novo* review, an alleged oral or implied partnership agreement.

For the reasons explained below, we conclude that the enactment of ORS 67.055 displaced much of the precedent as to the first issue—identification of partnership characteristics—but it did not displace the case law as to the second issue—the establishment of particular evidentiary standards.

■■ Most importantly, under ORS 67.055(1), a partnership may be created unintentionally by the parties. Thus, the parties' actual intent is no longer the "essential test" for

determining the existence of a partnership. *Compare* ORS 67.055(1) ("[T]he association of two or more persons to carry on as co-owners a business for profit creates a partnership, whether or not the persons intend to create a partnership."), *with Hayes*, 235 Or at 471 ("The essential test in determining the existence of a partnership is whether the parties intended to establish such a relation."). The parties' "expression of an intent to be partners" is, instead, but one factor to be considered by the finder of fact in determining whether persons have created a partnership. *See* ORS 67.055(4)(a)(B).

■ ORS 67.055(4)(a) codifies a nonexclusive list of five factors indicating the existence of a partnership. That list is nonexclusive because of the use of the term "include" in the statutory text. *See* ORS 67.055(4)(a) ("Factors indicating that persons have created a partnership include [certain enumerated factors]."); *State v. Courtier*, 166 Or App 514, 517, 997 P2d 894 (2000) (ordinance defining "deadly or dangerous weapon" by use of the term "includes" was not limited to those weapons particularly described and identified). Of the listed factors in ORS 67.055(4)(a), three correspond to the "earmarks of a partnership" identified in *Hayes*: receipt of or right to receive a share of profits, sharing or agreeing to share losses, and participation or right to participate in control of the business. *Compare* ORS 67.055(4)(a)(A), (C), (D), *with Hayes*, 235 Or at 471. The remaining two factors are the parties' expression of an intent to be partners and the contribution or agreement to contribute money or property to the business. ORS 67.055(4)(a)(B), (E). Because the statutory list of factors indicating a partnership is nonexclusive, it may be supplemented. Examination of the entire factual setup as a whole, *see Hayes*, 235 Or at 471, therefore remains a proper inquiry when determining whether a partnership has been created.

■ The statutory text of ORS 67.055 does not indicate which factors *must* exist for the creation of a partnership to have occurred. And, in fact, the text indicates that one of the factors—an agreement to share losses—is not necessary to create a partnership. *Compare* ORS 67.055(4)(e), *with Hayes*, 235 Or at 477 ("Joint control as well as an agreement to share the profits and losses is generally essential to a * * * partnership."). In addition, although the statutory text of ORS

67.055 does not expressly indicate the relative weight of the five factors, it can be inferred that receiving a share of profits is the most important because the sharing of profits is the only factor that creates a rebuttable presumption that a partnership has been created. *See* ORS 67.055(4)(d).

Nothing in ORS 67.055, however, addresses the nature of the evidence that a party must produce to establish an oral partnership agreement between the parties. The statute does not address who bears the burden of proving the alleged partnership, *see Preston*, 174 Or at 562 (the party alleging the partnership bears the burden of proof), or what quantity of evidence produced by that party will create a jury question, *see id.* (substantial evidence creates a jury question). Nor does the statute explain how evidence that is equally consistent with both the existence and the nonexistence of a partnership affects the analysis. *See id.* at 566 (that type of evidence does not necessarily raise an inference of partnership). In addition, the statute does not reveal what type of evidence is insufficient, on *de novo* review, to prove an oral or implied partnership agreement. *See Burnett*, 185 Or at 62 (self-serving declaration evidence is insufficient to prove an oral partnership); *Oshatz*, 55 Or App at 177-78 (testimony as to what the parties agreed on is insufficient to prove an oral partnership).

Like the Supreme Court, when interpreting a statute, we "generally presume that the legislature enacts statutes in light of existing judicial decisions that have a direct bearing on those statutes." *Mastriano v. Board of Parole*, 342 Or 684, 693, 159 P3d 1151 (2007) (citation omitted). Moreover, as noted earlier, ORS 67.020(1) provides, "Unless displaced by particular provisions of this chapter, the principles of law and equity supplement this chapter." As no statutory provision disturbs the principles of law in *Preston, Burnett*, and *Oshatz* regarding the establishment of certain evidentiary standards, those principles remain supplemental to ORS 67.055.

B. *Application of controlling law to historical facts*

■ Bearing in mind the above understanding of controlling law, we now turn to apply that law to the facts of this

case. To briefly recall our standard of review, under ORCP 47 C, we must view the facts in the light most favorable to defendants to determine whether those facts would entitle defendants to a jury determination. If the facts justify the single inference in the minds of reasonable people that an oral partnership agreement did *not* exist between defendants and plaintiffs regarding development of the tract, then there is no genuine issue of material fact as to whether a partnership agreement existed as to the tract, as alleged by defendants, and plaintiffs are entitled to summary judgment as a matter of law.

### 1. *Self-serving declarations*

■ In response to plaintiffs' summary judgment motion, defendants presented the trial court with a lengthy declaration by Van Pelt as to the historical facts underlying the litigation. In that declaration, Van Pelt averred as to what the parties agreed—that they agreed to form a business in the nature of a partnership to develop the entire tract and that they agreed on certain terms for conducting that business. Those averments are of the type of subjective "self-serving declarations" that the courts in *Burnett* and *Oshatz* explained were insufficient, on *de novo* review, to establish the existence of an oral partnership agreement. *See Burnett*, 185 Or at 62; *Oshatz*, 55 Or App at 177-78. Because our review on summary judgment is not *de novo*, the evidentiary standards from *Burnett* and *Oshatz*, pertaining to "self-serving declarations," are inapplicable. Van Pelt's averments as to what the parties agreed will be considered where those averments are relevant to the factors of ORS 67.055 and the factual setup as a whole.

### 2. *Sharing of gross sales*

■ The record indicates that the parties agreed that Sierra Cascade would pay plaintiffs a percentage of gross sales of the pumice mined from the tract. And, beginning in 2004, Sierra Cascade paid plaintiffs eight percent of the gross sales of the pumice mined from the 180-acre parcel. The royalties paid from the 180-acre parcel are equally consistent with acts engaged in merely pursuant to the November 2001 quitclaim deed as they are with acts done pursuant to the

terms of the alleged partnership agreement. That evidence, therefore, does not necessarily raise an inference of partnership. *See Preston*, 174 Or at 566. In addition, only the sharing of *gross sales*, not the sharing of *profits*, is present in this case. Defendants here are not entitled to a rebuttable presumption that a partnership existed, and, further, they need to have produced still more evidence to sufficiently indicate that a partnership existed. *See* ORS 67.055(4)(c), (d).

3. *Expression of intent to be partners*

Van Pelt averred that the parties agreed that they would form a business venture in the nature of a partnership and plaintiffs thereafter referred to him as "partner" on numerous occasions. That conduct is some evidence of an expression of intent to be partners. *See* ORS 67.055(4)(a)(B).

4. *Participation or right to participate in control of the business*

The parties agreed that they would jointly develop the long-term strategic plan for developing the tract, but that Sierra Cascade would be responsible for the daily operations of the partnership. The parties detailed the dual phase development plan of the entire tract on several maps, one of which was owned and kept by Sierra Cascade. Around April 2000, David Wirth corrected Van Pelt's representation to the Klamath County Planning Commission that Sierra Cascade had exclusive mining rights to the 27,000 acres of the tract, by noting that the tract was actually 28,000 acres in size. Diana Wirth approved Sierra Cascade's marketing materials that indicated that the company had the "Largest Pumice Reserves in the nation" and that Sierra Cascade had "exclusive mining rights near Chemult, Oregon." David Wirth attended the April 2002 hearing on the original conditional use permit application, which covered land beyond the 180-acre parcel, and argued to the commission that there was no cloud on his title. In 2004, Sierra Cascade began mining the 180-acre parcel. By 2005, plaintiffs had made demands on Van Pelt that Sierra Cascade increase its operations capacity and purchase additional equipment.

As with the payment of royalties, the mining of the 180-acre parcel does not necessarily raise an inference of partnership because that evidence is equally consistent with acts engaged in merely pursuant to the November 2001 quitclaim deed as it is with acts done pursuant to the terms of the alleged partnership agreement. *See Preston,* 174 Or at 566. Taken in total, however, the above conduct by the parties is some evidence of the parties' participation or right to participate in control of the alleged partnership. *See* ORS 67.055(4)(a)(C).

### 5. *Contribution of money or property to the business*

The parties agreed that Sierra Cascade would provide investment money to pay development costs, purchase equipment and machinery, and initiate litigation to clear and confirm title to the tract in plaintiffs, and that Sierra Cascade would pay attorney fees to probate the tract. Defendants did, in fact, pay $5,000 in attorney fees related to probating the entire tract. Defendants also incurred $220,000 in attorney fees as a result of litigation against U.S. Timberlands— litigation that Van Pelt averred was settled by Sierra Cascade to reach agreement on the three-eighths mining interest issue raised at the April 2002 land use hearing, to obtain all of the surface access rights to the mineral mining of the tract, and to obtain U.S. Timberlands' agreement not to oppose DOGAMI applications on the tract.

Plaintiffs agreed to contribute to the partnership their interest in the mineral rights of the tract by deeding sections of the tract to Sierra Cascade as those sections became needed. Plaintiffs did, in fact, quitclaim to Sierra Cascade the 180-acre parcel. As with some of the other evidence in this case, the conveyance of the 180-acre parcel does not necessarily raise an inference of partnership on its own. Because a preexisting partnership agreement is not mentioned in the deed, the evidence is equally consistent with the partnership's nonexistence as it is with the partnership's existence. *See Preston,* 174 Or at 566. Taken in total, however, the above conduct by the parties is some evidence of the contribution of money and property to the alleged partnership. *See* ORS 67.055(4)(a)(E).

### 6. *Sharing of losses*

There is no evidence that the parties shared losses. That evidence is not necessary in order to create a partnership. ORS 67.055(4)(a)(D), (e).

### 7. *Remaining factual setup as a whole*

Lastly, we consider the remaining factual setup as a whole. The record indicates that, in August through December 2000, apparently after the parties allegedly entered into the oral partnership agreement in the first part of 2000, the parties considered seven written proposals concerning the ownership of the tract mineral rights. As with the November 2001 quitclaim deed, none of those proposals mention a preexisting partnership agreement. In addition, David Wirth testified at the April 2002 hearing on the original conditional use permit application that he and Diana Wirth had "sold the mineral rights for a royalty on so many acres, not all of it but so many acres, to Sierra Cascade." Further, the record indicates that Erkiaga, then a half-owner of Sierra Cascade, was neither part of the discussions in which the alleged partnership agreement was reached, nor was she later made aware of such an agreement by Van Pelt. And finally, the only other written documentation of the parties' relationship is plaintiffs' March 2003 letter, which Van Pelt shared with Sierra Cascade customers, that said:

> "The mineral right that Sierra Cascade owns, is part of the vast * * * Liskey mineral right encompassing some 28,000 contiguous acres in south central Oregon. * * *
>
> "* * * * *
>
> "The * * * Liskey mineral right is currently owned by Dave and Diana Wirth * * *."

Evidence of the factual setup as a whole is inconsistent with defendants' contention that an oral partnership existed.

### 8. *Genuine issue of material fact*

■ Having thoroughly reviewed the record as a whole, in the light most favorable to defendants, we conclude that defendants have presented sufficient evidence of a partnership to entitle them to a jury determination. Given the broad

and imprecise principles of law governing partnership creation, whether a partnership exists based on the evidence in the record will usually be a question for the jury.[10] Although the evidence presented by defendants is far from overwhelming, it is not as meager as the evidence offered in *Preston* or *Hayes*, cases where the trial court appropriately intervened to remove the case from the purvue of the jury. Defendants have presented evidence that, if believed, would support their theory; it is the role of the jury to determine whether that evidence is credible. We therefore conclude that the trial court erred in determining that defendants failed to present sufficient facts about the existence of an oral partnership agreement to create a jury question on that issue.

## V. STATUTE OF FRAUDS

■ Despite our conclusion that there is a genuine issue of material fact as to the creation and existence of an oral partnership agreement between the parties concerning the entire tract, we must nonetheless affirm the grant of summary judgment by the trial court if it is supported by the trial court's rulings on the application of either the statute of frauds or the parol evidence rule. We proceed, first, to consider the applicability of the statute of frauds, viewing the facts in the light most favorable to defendants. *See* ORCP 47 C.

Defendants argue that the alleged oral partnership agreement is not subject to the statute of frauds and that the trial court erred in holding otherwise. Specifically, the trial court concluded:

"[T]he partnership agreement as alleged, is an agreement dependent upon a promise by [plaintiffs] to transfer their interest in the land to Sierra Cascade and thus would be subject to the Statute of Frauds."

Defendants contend that their partnership agreement with plaintiffs never included a transfer of plaintiffs' interest in the tract to Sierra Cascade and, specifically, did not include a

---

[10] "What will constitute a partnership is a matter of law, but whether the partnership exists under the evidence is one of fact for the jury, unless, in the opinion of the Court, but one inference can be drawn by reasonable men." *Hayes*, 235 Or at 470 (internal quotations marks omitted).

transfer of title. Rather, according to defendants, "the partnership simply allows Sierra Cascade to mine and remove pumice, sell it to third parties, and then pay plaintiffs a percentage of the resulting sales." Defendants argue that there is a difference between a partnership agreement *affecting* real property, where the goal is to make profits by selling minerals taken from the property, and an agreement *to transfer* real property, such as a title transfer of the mineral rights. The former, defendants contend, is outside the statute of frauds, while the latter is within it.

Plaintiffs argue that the alleged agreement in this case, however, *does* involve a transfer of real property. Plaintiffs contend that, under defendants' description of the terms of the agreement, plaintiffs agreed to transfer to Sierra Cascade their exclusive right to mine and remove pumice from the tract. That transfer, plaintiffs argue, constituted the transfer of a *profit à prendre* or, alternatively, of a mining claim, both of which are subject to the statute of frauds. Plaintiffs also argue that, even if the agreement did not constitute the transfer of an "interest" in real property, it nonetheless constituted the transfer of a "power concerning such property" so as to be subject to ORS 93.020(1), a codification of the statute of frauds relating to real property.[11]

We begin our consideration of the parties' arguments by looking at the defendants' allegations as to the

---

[11] Two statutory provisions codify the statute of frauds as it applies to real property. The statute on which plaintiffs rely, ORS 93.020(1), provides:

"No estate or interest in real property, other than a lease for term not exceeding one year, nor any trust or power concerning such property, can be created, transferred or declared otherwise than by operation of law or by a conveyance or other instrument in writing, subscribed by the party creating, transferring or declaring it, or by the lawful agent of the party under written authority, and executed with such formalities as are required by law."

In addition, ORS 41.580(1) similarly provides, in part:

"In the following cases the agreement is void unless it, or some note or memorandum thereof, expressing the consideration, is in writing and subscribed by the party to be charged, or by the lawfully authorized agent of the party; evidence, therefore, of the agreement shall not be received other than the writing, or secondary evidence of its contents in the cases prescribed by law:

"* * * * *

"(e) An agreement for the leasing for a longer period than one year, or for the sale of real property, or of any interest therein."

nature and terms of the partnership agreement. Based on those allegations, we will then determine if the legal effect of the agreement involved the transfer of an interest in land. According to defendants' responsive pleading, plaintiffs "agreed to contribute to the partnership their interest in the mineral rights of the Liskey Estate Tract." Defendants also alleged that the terms of the partnership agreement provided that "Sierra [Cascade] and Van Pelt would develop, operate, mine, remove, market and sell pumice from the Liskey Estate Tract" and that "[plaintiffs] would allow Sierra [Cascade] to be the exclusive development, mining, and sales operator for the entire Liskey Estate Tract." Van Pelt's declaration describes virtually identical terms to those alleged in his own responsive pleading. As noted above, Van Pelt's declaration explains that plaintiffs "wanted to deed smaller sections [of the tract] to Sierra Cascade as they became needed so that [plaintiffs] could protect themselves and their mineral right." He further specifies that "the initial conveyance of land [in the November 2001 quitclaim deed] was only a small part of the Agreement reached by the parties[ ]" and that "[t]he entire idea of using the quitclaim deeds and phases was to shield [plaintiffs] from liabilities."

We conclude that the alleged oral partnership agreement, as described by defendants, contemplated a transfer to the partnership of plaintiffs' mineral interest in the tract, to be achieved over time through the process of deeding to Sierra Cascade sections of the tract as they became needed. The question is whether the alleged contemplated transfer and its method of achievement were required to be in writing to be enforceable.

It has been the established common law in Oregon for over a century that "a partnership agreement which has for its purpose the purchase, improvement and sale of real estate for profit is not within the operation of the statute of frauds." *Harestad v. Weitzel*, 272 Or 199, 208, 536 P2d 522 (1975) (citing *Flower v. Barnekoff*, 20 Or 132, 138, 25 P 370 (1890)). Similarly, "[w]here title to real property is involved [in a dispute between partners dealing in land], * * * a court may properly decree that one partner holds the title to the

real property in trust for the other partner." *Id.* at 208-09 (citing *Terry v. Simmons,* 261 Or 626, 638-39, 496 P2d 11 (1972)).

The court in *Harestad* considered whether the plaintiff was entitled to share as a partner in profits from the sale of an apartment complex. 272 Or at 200-01. The parties in that case had made an oral agreement to be partners in a real estate and building business. Shortly thereafter, the defendant purchased a tract of unimproved land in his name and with his funds for the purpose of constructing an apartment complex. Before completion of the complex's construction, the property was sold under an earnest money agreement naming only the defendant as the seller. *Id.* at 201-02. The parties thereafter executed a written partnership agreement "for the purpose of carrying on the business of 'Real Estate and building[.]' " *Id.* at 203. The defendant argued that "a partnership agreement extending to the apartment project 'is one squarely within the ambit of the statute of frauds,' so that oral proof of such an agreement is prohibited by the terms of ORS 41.580(1), (5), and was therefore inadmissible." *Id.* at 208 (footnote omitted). The court, however, relied on *Flower* and *Terry* and concluded that "the scope of the business subject to that agreement could properly be proved by parol evidence." *Id.* at 209 (footnote omitted).

Taking the conclusion in *Harestad* one step further, the court in *Wright v. Ogle,* 283 Or 505, 508, 584 P2d 737 (1978), stated that "[w]ritten evidence is not required, however, when members of a partnership agree to transfer land to a partnership engaged in developing and selling land." (Citation omitted.) In that case, the primary dispute among the parties, who were former partners, involved the contributions and capital that the defendants were to have made to the partnership. *Id.* at 507. The plaintiffs contended that one of the defendants had agreed to contribute his interest in three properties to the partnership; however, there were no written documents to support the plaintiffs' position. *Id.* at 507-08. On *de novo* review, the court ultimately concluded that, although a writing was not necessary for the plaintiffs to prove their case, the absence of such a writing between experienced businessmen who regularly engaged in real property transactions was evidence that no such agreement

to contribute the three properties ever actually existed. *Id.* at 508.

 The holdings of *Flower* and its progeny, including *Wright*, only apply to except from the statute of frauds agreements concerning the transfer of land, or interests therein in two situations: transfers from partner to partnership and transfers from partner to partner, on behalf of the partnership. In those cases, the parties will be amply protected from fraud in identifying partnership property and the partners' respective interests therein by ORS 67.065.[12] That statute creates policies to distinguish partnership property from separate property owned by an individual partner.[13]

[12] ORS 67.065, similar to the Uniform Partnership Act (1997), section 204, volume 6, part 1 ULA 97 (1997) (commonly referred to as "RUPA") relating to partnership property, provides:

"(1) Property is partnership property if acquired in the name of:

"(a) The partnership; or

"(b) One or more partners with an indication in the instrument transferring title to the property of the person's capacity as a partner or of the existence of a partnership but without an indication of the name of the partnership.

"(2) Property is acquired in the name of the partnership by a transfer to:

"(a) The partnership in its name; or

"(b) One or more partners in their capacity as partners in the partnership, if the name of the partnership is indicated in the instrument transferring title to the property.

"(3) It is a rebuttable presumption that property is partnership property if purchased with partnership assets, even if not acquired in the name of the partnership or of one or more partners with an indication in the instrument transferring title to the property of the person's capacity as a partner or of the existence of a partnership.

"(4) It is a rebuttable presumption that property acquired in the name of one or more of the partners, without an indication in the instrument transferring title to the property of the person's capacity as a partner or of the existence of a partnership and without use of partnership assets, is separate property, even if used for partnership purposes."

ORS 67.065, like RUPA section 204, emphasizes the concept of record title and, therefore, generally allows partners and third parties dealing with partnerships to be able to rely on the record title to determine whether property is owned by the partnership. *See* RUPA § 204 Comments 2, 4, vol 6, pt 1 ULA 98 (1997). The statute, however, also contemplates that the presumption that property is separate property, if acquired in the name of a partner without indication of the person's capacity as a partner or of the existence of the partnership, can be rebutted by additional evidence. *See* ORS 67.065(4).

[13] Caroline N. Brown, 4 *Corbin on Contracts* § 17.12 at 465 (Joseph M. Perillo ed., rev ed 1997) is in accord:

"[T]here seems little necessity to invoke the statute [of frauds] in order to protect the parties in title-holding partnerships, there being adequate protection

Given our conclusion that there is a genuine issue of material fact as to the existence of a partnership between the parties, the rule of *Wright* controls: if a partnership has been established for the purpose of dealing in land, no writing is necessary to prove that a partner has agreed to transfer his or her interest in certain lands to the partnership. 283 Or at 508. We discern no difference between a partnership dealing in land and a partnership dealing in mineral interests therein, as was alleged in this case.[14] For those reasons, the statute of frauds does not apply to render void, or

---

furnished by the provisions of the [Uniform Partnership Act (UPA)] to lend reliability to the identification of partnership property and the interests of the partners in it. In light of the evidentiary standards afforded by those provisions, injustice is more apt to be avoided by giving effect to the oral partnership agreement under the [UPA's] liberal rule rather than by refusing enforcement under the statute of frauds[.] * * * Given the great confusion in the caselaw and the potential difficulty of fitting cases into the rather strained categories suggested by the cases, it seems best to advocate a brightline rule, where there is ample evidence of the partnership and the [UPA] applies. In such cases, it is suggested that any agreement between partners relating to or bringing real property within the framework of a partnership should be held *not* within the statute [of frauds].

"This rule, however, should not apply when the evidence of the partnership itself is less than clear and convincing. The absence of clear evidence justifies the protection of the statute of frauds, and no important policy of the UPA appears to be diminished by its application."

[14] Our conclusion is limited to the facts of this case, where ORS 517.110, pertaining to "grubstaking contracts," does not apply. That statute provides:

"All contracts of mining copartnership, commonly known as 'grubstaking,' shall be in writing, and recorded with the clerk of the county wherein the locations thereunder are made. Unless contracts of mining copartnership contain the names of the parties thereto and the duration thereof, the contracts are void."

Originally codified in 1898, *see* The Codes and Statutes of Oregon, title XXXVI, ch III, § 3985 (Bellinger & Cotton 1901), ORS 517.110 has remained largely unchanged over the past century. At the time of the statute's codification, a "grub stake" contract was understood to encompass "the search for and location of mines on the public domain," wherein "one, called the outfitter, supplies the 'grub,' and the other, called the prospector, performs the labor, and all discoveries inure to the benefit of the parties in the proportion fixed by the agreement." 2 *Lindley on Mines* § 858 (1897) (footnote omitted). Grub stake contracts were generally held to be outside the statute of frauds. *Id.* Oregon, however, was one of several western states to explicitly require grub stake contracts to be in writing. Alfred H. Ricketts, 1 *American Mining Law* § 907 (4th ed 1948).

Given that historical context, we conclude that ORS 517.110 is aimed at a narrowly defined category of mining agreements. We express no opinion as to whether the policy underlying the statute extends to other mining agreements and business arrangements. We merely note that the alleged agreement dealing in mineral interests in this case is not a grub stake contract for purposes of ORS 517.110.

unenforceable, any oral agreement by the plaintiffs to transfer to the alleged partnership their mineral interest in the tract by way of a series of quitclaim deeds to Sierra Cascade covering particular sections. The trial court erred in holding otherwise.

## VI. PAROL EVIDENCE RULE

■ Lastly, we consider the applicability of the parol evidence rule to the evidence in this case. The parol evidence rule is codified by ORS 41.740 and provides:

> "When the terms of an agreement have been reduced to writing by the parties, it is to be considered as containing all those terms, and therefore there can be, between the parties and their representatives or successors in interest, no evidence of the terms of the agreement, other than the contents of the writing, except where a mistake or imperfection of the writing is put in issue by the pleadings or where the validity of the agreement is the fact in dispute. However this section does not exclude other evidence of the circumstances under which the agreement was made, or to which it relates, as defined in ORS 42.220, or to explain an ambiguity, intrinsic or extrinsic, or to establish illegality or fraud. The term 'agreement' includes deeds and wills as well as contracts between parties."

Oregon courts have never read that statute in a literal manner, but have instead " 'treated the statute as a codification of the common law parol evidence rule.' " *Abercrombie v. Hayden Corp.*, 320 Or 279, 286, 883 P2d 845 (1994) (quoting *Hatley v. Stafford*, 284 Or 523, 526 n 1, 588 P2d 603 (1978)).

■ The parol evidence rule is a substantive, not an evidentiary, rule because " 'it declare[s] that certain kinds of fact are legally ineffective in the substantive law.' " *Id.* (quoting 9 Wigmore, Evidence § 2400 (Chadbourn rev 1981); brackets in *Abercrombie*). The rule's purpose is to promote commercial certainty between contracting parties. *Id.*

> "The parol evidence rule, in brief, provides that a binding, completely integrated, written agreement supersedes or discharges all agreements, written or oral, that were made before the completely integrated agreement, to the extent that the prior agreements are within the scope of the completely integrated agreement. Restatement (Second) of

Contracts § 213(2) (1979). The rule also provides that a binding, partially integrated, written agreement supersedes or discharges all agreements, written or oral, that were made before the partially integrated agreement, to the extent that the prior agreements are inconsistent with the partially integrated agreement. Restatement (Second) of Contracts § 213(1) (1979)."

*Id.* at 286-87 (footnote omitted).

"An integrated agreement is one that the parties intended to be a final expression of some or all of the terms of the agreement." *Id.* at 287 (citations omitted).

"An integrated writing is partially integrated if the writing omits a consistent, additional agreed-upon term, which was (1) agreed to by the parties for separate consideration, or (2) such a term as in the circumstances might naturally be omitted from the writing. Otherwise, the integrated writing is completely integrated."

*Id.* at 289 (citations omitted). "A prior agreement is 'inconsistent' with the terms of an integrated writing if it contradicts or negates an express term in the writing." *Id.* (citation omitted).

The trial court determined that the November 2001 quitclaim deed is an integrated writing and that earlier deeds containing different terms were rejected by the parties. The trial court also determined that, even if the November 2001 quitclaim deed is not an integrated agreement, "evidence of an oral partnership agreement is not a consistent additional term" and that it "cannot find that the partnership agreement and scope of alleged future business operations as asserted by Mr. Van Pelt are something these sophisticated parties would naturally omit from the deed."

On appeal, defendants argue that the trial court erred in applying the parol evidence rule to bar defendants' evidence of the alleged oral partnership agreement. Defendants contend that the November 2001 quitclaim deed is at best a partially integrated writing and that the larger partnership agreement includes additional agreed-upon terms that are not inconsistent with the quitclaim deed, have separate consideration, and are such as might naturally be omitted from the quitclaim deed.

Plaintiffs respond that, regardless of whether the November 2001 quitclaim deed is considered to be a completely integrated writing or a partially integrated writing, the alleged oral partnership agreement, by which Sierra Cascade asserts an exclusive right to mine the entire tract, is "utterly inconsistent" with that deed. Plaintiffs also contend that, even if the alleged prior partnership agreement was not inconsistent with the quitclaim deed, the parol evidence rule would still bar evidence of that agreement because it is "clearly one the parties 'naturally' would have reduced to writing."

The parties do not dispute that the November 2001 quitclaim deed is final as to its terms—that it is an integrated agreement. Our inquiry, therefore, is directed towards discerning whether that integrated agreement is a partial or complete integration. Again, we view the facts in the light most favorable to defendants. *See* ORCP 47 C. To reiterate the rule of *Abercrombie*, the deed will be partially integrated if the alleged prior partnership agreement (1) is a consistent additional term and (2) is supported by separate consideration or is a term as might naturally be omitted from the deed under the circumstances.

First, we conclude that the alleged prior partnership agreement is an additional agreed-upon term that does not negate or contradict an express term of the quitclaim deed. The November 2001 quitclaim deed conveys title to the mineral rights in a 180-acre parcel of the tract in exchange for $3,000, a royalty of eight percent, and other value given or promised. The alleged partnership agreement does not contradict those terms because it is not offered as evidence that the parties agreed to a *present* transfer of title to the mineral rights in a greater- or lesser-sized parcel or that the royalty to be paid to plaintiffs was something other than eight percent. Nor does the partnership agreement contradict any other terms of the quitclaim deed. The quitclaim deed could simply be, as defendants have argued, a partial implementation of the broader partnership agreement.

Second, we conclude that separate consideration supports the alleged prior partnership agreement and the quitclaim deed. As consideration for the alleged partnership

agreement, (1) Sierra Cascade agreed to provide investment money to pay development costs, purchase equipment and machinery, initiate litigation to clear and confirm title to the tract in plaintiffs, pay attorney fees associated with probating the tract, and pay plaintiffs a percentage of the gross sales of the pumice mined from the tract; and (2) plaintiffs agreed to transfer to Sierra Cascade, *in the future,* their interest in sections of the tract as those sections became needed. By comparison, as consideration for the November 2001 quitclaim deed, (1) Sierra Cascade agreed to pay plaintiffs $3,000, a royalty of eight percent of the gross sales of pumice mined from the 180-acre parcel, and other value given or promised; and (2) plaintiffs agreed to transfer to Sierra Cascade, *in the present,* their interest in the 180-acre parcel.[15]

Thus, we conclude that, under our standard of review on summary judgment, the November 2001 quitclaim deed is a partially integrated agreement and the parol evidence rule is inapplicable to bar evidence of the alleged prior partnership agreement. The trial court erred in holding otherwise.

For all of the foregoing reasons, the trial court erred in granting plaintiffs summary judgment on their declaratory judgment claim. Further, given the trial court's errors in granting summary judgment on plaintiffs' declaratory judgment claim, the dismissal of defendants' eight counterclaims was likewise in error. We therefore reverse the grant of summary judgment on plaintiff's declaratory judgment claim and the dismissal of defendants' eight counterclaims.

Reversed and remanded.

**WOLLHEIM, P. J.,** concurring.

I concur with the majority opinion's holding that the trial court erred in granting plaintiffs' motion for summary judgment. The trial court erred because there are genuine

---

[15] Because we conclude that the prior alleged partnership agreement was supported by separate consideration, we need not determine whether that agreement is a term that, under the circumstances, the parties might have naturally omitted from the November 2001 quitclaim deed.

issues of material fact that must be determined by a fact-finder. For example, there are genuine issues of material fact regarding the existence of an oral partnership agreement between plaintiffs and defendants and, if an oral partnership between the parties exists, the number of acres included therein. Because there are genuine issues of material fact, I concur with the majority opinion's conclusion that the limited judgment must be reversed and remanded.